**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

| | | |
|---|---|---|
| MIKAYLA EVANS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No.: |
| | ) | |
| v. | ) | |
| | ) | |
| JOHNSON CITY, a government entity, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| KARL TURNER, individually and in his official capacity as Chief of Johnson City Police Department, | ) | |
| | ) | |
| | ) | |
| | ) | |
| KEVIN PETERS, individually and in his official capacity as Captain of the Johnson City Police Department, | ) | |
| | ) | |
| | ) | |
| | ) | |
| TOMA SPARKS, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| | ) | |
| | ) | |
| | ) | |
| JUSTIN JENKINS, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| | ) | |
| | ) | |
| | ) | |
| JEFF LEGAULT, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) | |
| | ) | |
| | ) | |
| | ) | |
| BRADY HIGGINS, individually and in his official capacity as Investigator of the Johnson City Police Department, and | ) | |
| | ) | |
| | ) | |
| | ) | |
| DOES 8-20, inclusive, | ) | |
| | ) | |
| *Defendants.* | ) | |

1

## COMPLAINT

Plaintiff MIKAYLA EVANS ("Plaintiff"), by and through her undersigned attorneys, for her Complaint against defendants JOHNSON CITY, KARL TURNER, KEVIN PETERS, TOMA SPARKS, JUSTIN JENKINS, JEFF LEGAULT, BRADY HIGGINS, AND DOES 8-20 (collectively as "Defendants"), alleges, on knowledge as to her actions, and otherwise on information and belief, as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is domiciled in Tennessee and a resident of Sullivan County, Tennessee.

2.      Defendant Johnson City, Tennessee, ("Defendant City" or collectively "Defendants"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

3.      Defendant Chief Karl Turner is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

4.      Defendant Captain Kevin Peters is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

5.      Defendant Investigator Toma Sparks is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

6.      Defendant Investigator Justin Jenkins is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

7.      Defendant Investigator Jeff Legault is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

8.     Defendant Investigator Brady Higgins is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

9.     Defendant Officers John Does 8 through 20 are Johnson City Police Officers. Plaintiffs name them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

10.     Plaintiff is informed and believes and thereon alleges that each of the Defendants are responsible individually and as an agent, contributor, and co-conspirator in a single enterprise with and as the alter ego of all other Defendants.

11.     At all relevant times, the unlawful conduct against Plaintiff as described herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described herein was committed under actual or apparent authority granted by Defendants such that all of the unlawful conduct of all Defendants is legally attributable to all other Defendants.

12.     At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described herein, unless otherwise indicated, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

13.     Plaintiff brings this action pursuant to the Tennessee Governmental Tort Liability Act and Tenn. Code Ann. § 29-20-205; 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution; and the common law.

14.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

15.     Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

3

# FACTUAL ALLEGATIONS

### I.    Introduction

16.    Beginning in 2018 at the latest and continuing until his escape in 2021, Sean Williams ("Williams"), with the aid of Defendants, conspired with Alvaro Fernando Diaz-Vargas and others to drug, assault, and sexually exploit women and minors, in his downtown Johnson City apartment. These crimes occurred despite Defendants' knowledge of the same.

17.    At all times relevant herein, Williams lived in a fifth-floor apartment located in downtown Johnson City. Williams operated Glass and Concrete Contracting, LLC, along with his accomplice Diaz-Vargas. Williams and others used Glass and Concrete Contracting, LLC, as a front to buy and sell narcotics.

18.    Williams developed a modus operandi by which he attracted, drugged, and raped women. First, he would meet young women often using the aid of young male associates to identify the women. Williams then would offer the women alcohol and/or cocaine to entice them to come to his apartment. Once the women consumed the alcohol and/or cocaine provided by Williams they would pass out. Once the women regained consciousness, they would discover they'd been sexually assaulted.

19.    Williams was allowed to continue this pattern of criminal behavior without consequences by bribing Defendants working for the Johnson City Police Department to prevent investigations and/or cover up evidence of his crimes.

20.    Williams has an extensive criminal record from 1989-2004. Except for a few North Carolina criminal charges in 2009 and 2013, Williams' criminal record drastically declines once he moves to Johnson City in late 2004 likely because of his conspiratorial relationship with Defendants manifested through illegal bribes.

4

21.     Defendants did not investigate, arrest, or charge Williams when women reported being drugged and raped by Williams. Instead, Defendants accepted a weekly bribe of at least $2,000.00 from Williams' accomplice. Defendants willfully ignored reports, intimidated and belittled the victims, and discouraged pursuit of legal remedies because of Williams' weekly bribes.

22.     Williams continued trafficking guns and drugs, drugging and raping women, and sexually exploiting children for years because Defendants failed to investigate, arrest, or charge Williams.

23.     As a result of Defendants accepting the bribes and turning a blind eye, Plaintiff was drugged by Williams and pushed by him out a five-story window, sustaining life-threatening injuries on September 19, 2020.

24.     On or about June 23, 2022, Special Assistant United States Attorney Kateri Lynne Dahl, initiated a civil action against Defendants for her unlawful firing. Dahl alleges her termination was a result of her insistence on investigating Williams, an investigation that Defendants had a vested interest in preventing as it likely would uncover their unlawful actions in protecting Williams.

25.     Following Dahl's complaint on June 21, 2023, another civil complaint was filed against Defendants by a handful of Williams' victims, alleging among other things that Defendants intentionally failed to investigate Williams in exchange for weekly bribes. On September 6, 2023, an amended class complaint was filed alleging in detail the affirmative acts taken by Defendants after Plaintiff's fall to cover up and protect Williams from charges related to the incident. A second amended class complaint was filed on March 1, 2024, bringing additional allegations. The complaints collectively herein referred to as the "Class Complaint."

   **1.  Plaintiff's Incident**

26.     On September 19, 2020, Plaintiff was out in downtown Johnson City with a couple of friends. Plaintiff had consumed a couple of beers but was not intoxicated. She was supposed to

meet her friend Albert Watts at the downtown Johnson City bar Wonderland Lounge and Grill. While waiting for Albert at Wonderland, Albert texted Plaintiff and told her he could not find the bar. Plaintiff decided she would meet Albert and walk with him to Wonderland. When Plaintiff walked down the street outside of Wonderland she found Albert standing outside of William's garage watching Williams and two individuals partying inside. Once Plaintiff walked up to Albert, she noticed loud music and lights coming from the garage and mentioned to Albert that it looked like a fun time. Plaintiff then heard a voice from inside the garage say "come on in." After further encouragement from Albert, the two of them entered Williams' garage.

27.    Within twenty minutes of arriving at the party, Plaintiff began feeling the effects of a drug, and her speech began to slur. Shortly after, by information and belief Williams invited Plaintiff and Albert to his apartment across the street. Though Plaintiff has no memory of entering Williams' apartment, surveillance footage shows Plaintiff, Williams, and Albert entering Williams' apartment.

28.    At approximately 2:34 a.m., upon information and belief, Williams attempted to sexually assault Plaintiff and during this altercation, pushed Plaintiff out of his five-story apartment building window. Soon after Plaintiff was pushed, and before he could speak to law enforcement, Albert fled the scene.

29.    Plaintiff was admitted to the hospital and underwent multiple surgeries. Plaintiff's injuries included pelvic fracture, humeral fracture, radius fracture, dislocated elbow, calcaneus fracture, talar neck fracture, multiple metatarsal fractures, fabular avulsion, navicular fracture, calcaneus fracture, fibula fracture, cuneiform fracture, cuboid fracture, multiple facial and skull fractures, and multiple lumbar fractures. Upon admission to the hospital, Plaintiff was intubated because she

was in respiratory failure. Plaintiff was discharged from the hospital on October 16, 2020. However, Plaintiff would be bedridden and unable to care for herself until the summer of 2022.

30.     At the hospital, JCPD did not allow Plaintiff to be tested for date-rape drugs despite multiple requests by Plaintiff's mother. Plaintiff's rape kit was not properly administered. Plaintiff's blood was sent to the crime lab for analysis, but Plaintiff did not receive the toxicology report until about one year later at which point the blood was already destroyed. Defendant Sparks received the toxicology report on or around January 19, 2021. Defendant Sparks emailed the toxicology report to Plaintiff on or around January 20, 2022. The blood was destroyed on or around September 1, 2021.

## II.     JCPD Actions

34.     On September 19, 2021, following Plaintiff's fall JCPD arrived with other first responders to investigate the incident.

35.     According to the Government's response to Williams' motion to suppress in the now-dismissed felon in possession of ammunition case, see United States v. Williams, 2:21-cr-00027-DCLC-CRW, Doc. No. 38 ("Government's response"), Defendants Sparks and Jenkins arrived at Williams' apartment on September 19, 2020, sometime after the first JCPD officers arrived on the scene. The two officers shouted up to Williams' apartment from the street, asking to be let in, and eventually obtained the passcode to enter the apartment from someone on the scene.

36.     After obtaining entrance to Williams' apartment, Defendants Sparks and Jenkins took control of interviewing Williams and securing any digital evidence stored on Williams' cell phone, which was linked to cameras throughout Williams' apartment.

37.     Defendant Sparks escorted Williams to JCPD headquarters. Defendants Sparks and Jenkins interviewed Williams at JCPD headquarters. During the thirty-minute interview, Defendants

Sparks and Jenkins allowed Williams to keep his cell phone, which had access to the video surveillance cameras in his apartment. After the interview, Defendants left Williams alone with his cell phone.

38.     Per the Government's response, Williams manipulated his cell phone, made phone calls from his cell phone during this time, and erased all the data from his cell phone. After this, Defendant Sparks seized Williams' cell phone and applied for a search warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

39.     During this time, Williams' apartment was left unsecured. Per the Government's response, when JCPD officers returned to execute the search warrant on September 19, 2020, the video surveillance cameras, which were observed hours before at Williams' apartment, had been removed and hidden in a closet under paper towels.

40.     JCPD officers seized four phones, four computers, and three memory cards from Williams' apartment.

41.     Upon information and belief, the digital devices remained in the custody of JCPD for over two years without being searched for evidence.

42.     JCPD officers did not arrest Williams on September 19, 2020, Williams fled from Tennessee in May of 2021.

43.     In a recent Opposition in Response to Motion to Quash filed in the case *Jane Does 1-9 v. City of Johnson City, Tennessee, et al*., Case No. 2:23-cv-00071-TRM-JEM, Doc. No. 190, in the Eastern District of Tennessee, bank records have been produced showing Williams had an accomplice named "Female 4" that withdrew at least $2,000 a week from Williams' various shell companies and paid Defendants Sparks and the other investigators.

44.     By information and belief, Defendant Sparks and the other investigators were paid through the summer of 2022.

### III.     Plaintiff Could Not Have Learned of JCPD's Intentional Failure to Investigate Williams Following Her Fall Until the First Amended Class Complaint was filed on September 6, 2023.

45.     Plaintiff learned of Defendants' intentional mishandling of her investigation no earlier than the filing of the first amended Class Complaint on September 6th, 2023.

46.     Although, before this date, Plaintiff was aware that the JCPD failed to bring charges against Williams related to the incident and that JCPD even indicated as early as September 21, 2020 (two days after the incident), that they did NOT suspect foul play Plaintiff believed JCPD was investigating the incident. She had no knowledge that JCPD intentionally failed to investigate Williams to protect both Williams in exchange for bribes, and themselves from being discovered for accepting these bribes.

47.     Plaintiff was not aware that Williams was "untouchable" because he had bought off the JCPD. In fact, Plaintiff trusted JCPD and specifically Defendant Sparks to investigate her fall. She continued to cooperate and speak to Sparks about the investigation until Sparks stopped returning her phone calls over a year after the incident.

48.     The Class Complaint revealed JCPD officers arrived at Williams' apartment shortly after the incident occurred that night. According to the Government's response to Williams' motion to suppress in the pending felon in possession of ammunition case, *see United States v. Williams*, 2:21-cr-00027-DCLC-CRW, Doc. No. 38 ("Government's response"), Det. Sparks arrived sometime thereafter with another JCPD officer, Justin Jenkins. The two officers shouted up to Williams' apartment from the street, asking to be let in, and eventually obtained the passcode to enter the apartment from someone on the scene.

49.     Inside the apartment, Williams showed Det. Sparks and Officer Jenkins video clips taken from cameras positioned around his apartment, including a camera facing the entrance door to the apartment and a camera facing the elevators. Williams used his cellphone to show these videos to the officers and even offered to text the videos to Officer Jenkins. Williams claimed that the video cameras inside his apartment which pointed towards the window out of which Plaintiff fell were not recording on September 19, 2020. While at Williams' apartment on September 19, 2020, Defendants took Williams' safe, which kept $500,000. When the safe was returned to Williams, only $81,000 was left per the Class Action Complaint, ¶ 86. Defendants likely took the money as payment for not investigating Williams for his actions on September 19, 2020.

50.     On information and belief, shortly thereafter, Williams told the officers to leave the apartment.

51.     Rather than secure Williams' apartment or any of the digital media which may have contained evidence while they sought a search warrant for the attempted homicide investigation, JCPD officers left.

52.     After the officers left, on information and belief, Williams and/or Diaz-Vargas moved and hid firearms and illicit drugs located throughout the apartment. Williams and/or Diaz-Vargas placed the items in a duffle bag and moved them to the roof.

53.     According to the Government's response, later that morning at approximately 4:17 a.m., Det. Sparks and Officer Jenkins interviewed Williams at JCPD headquarters.

54.     Sometime before this interview (the exact time is not stated in the Government's response), Det. Sparks offered to drive Williams to JCPD headquarters from Williams' apartment downtown. Williams agreed. Det Sparks then gave Williams a ride in his car. Williams was not handcuffed,

and he rode in the front passenger seat next to Det. Sparks. There is no record in the Government's response, nor in the affidavits of Det. Sparks, of what the two spoke about during this ride.

55.     Williams' interview at JCPD headquarters was video recorded.

56.     At approximately 4:17 a.m., Williams was placed in an interview room. The door was left open, and Williams was not handcuffed.

57.     Even though Williams had just shown Det. Sparks digital evidence of the crime under investigation on his cellphone—demonstrating to Det. Sparks that Williams could access, and therefore likely manipulate, the camera footage from his phone—the officers permitted Williams to retain possession of his cellphone for the next 30 minutes while he sat in the interview room.

58.     From 4:17 a.m. to 4:20 a.m. Williams was alone in the interview room with his cellphone while Officer Jenkins got paperwork together.

59.     Once the interview began, at approximately 4:20 a.m., Officer Jenkins closed the door. Officer Jenkins and Williams began to speak about whether the surveillance cameras captured video of Plaintiff falling. Williams continued to maintain possession of his cellphone throughout this conversation.

60.     Williams then told Officer Jenkins that he could text Jenkins the videos he had previously shown them (Officer Jenkins and Det. Sparks). Officer Jenkins asked Williams to email the videos instead. Williams stated he believed he could email the videos and proceeded to look at his cellphone. According to the Government's response, Williams "became distracted" while looking at his cellphone. He then told Officer Jenkins that he could not find any videos of Plaintiff falling.

61.     Based on the timeline provided in the Government's response, it appears that Williams spent the next several minutes manipulating data on his cellphone while Officer Jenkins watched and took no action.

62.     Approximately eight minutes into their conversation, Officer Jenkins asked Williams for a statement about the incident. Officer Jenkins then read Williams *Miranda* warnings.

63.     Williams remarked that he thought it was strange that he was being read his rights. Officer Jenkins told Williams that he (Williams) was not under arrest and Officer Jenkins was simply reading *Miranda* warnings because he (Jenkins) was going to ask questions.

64.     Williams asked for a lawyer to be present, but then stated that he would give a statement but would not answer questions. Officer Jenkins and Williams began to discuss what Williams meant by wanting a lawyer but still agreeing to answer some questions, but not all. Officer Jenkins told Williams that they needed to come to an agreement before they could proceed with an interview. Officer Jenkins provided Williams with the written *Miranda* waiver for review, but Willims did not agree to sign it and instead asked for his lawyer.

65.     At approximately 4:35 a.m., Officer Jenkins left the room, continuing to allow Willims to maintain custody of his cellphone.

66.     For the next six minutes, Williams spoke to several people on the phone while purportedly attempting to call his lawyer.

67.     According to the Government's response, at some point Williams stated to someone over the phone that since he could not contact his lawyer he would just leave and come back to speak to the investigators later.

68.     At approximately 4:41 a.m., Williams knocked on the door of the interview room. Det. Sparks opened the door. Williams told Det. Sparks that he needed a charger for his phone so that he could call his attorney. Williams then asked what they would do if he could not contact his lawyer. Williams and Det. Sparks then discussed whether Williams wanted to speak to them without a lawyer.

69. At this point, over 30 minutes into Williams' interview and approximately two hours after Williams' first encounter with JCPD police on September 19, 2020, Det. Sparks seized Williams' cellphone. Det. Sparks then told Williams that he was getting a search warrant for its contents.

70. According to the Government's response, Det. Sparks and Williams then argued over whether Det. Sparks could seize Williams' cellphone.

71. Williams asked whether Det. Sparks would give him a ride home, and Det. Sparks agreed to drive him home.

72. At approximately 4:46 a.m., Det. Sparks told Williams he would be right back. At Approximately 4:51 a.m., Williams opened the door of the interview room and asked to leave. Williams asked for his cellphone but was told it had been seized pending a search warrant.

73. At some point thereafter—the Government's response does not state the time—Williams left JCPD headquarters and walked back to his apartment.

74. At 8:52 a.m. on September 19, 2020, Det. Sparks applied for a warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

75. According to Det. Sparks' September 19, 2020, affidavit in support of this warrant, JCPD officers "powered off" Williams' cellphone at some point that morning and then powered the phone back on "after Williams left" with the intent to place the phone in airplane mode. The affidavit goes on to state: "When the phone was powered on, it had a message displaying that it was lost, which would suggest that Sean Williams has access to other devices in the residence that could be connected to the camera system."

76. In his affidavit, Det. Sparks then sought permission to seize: "video surveillance cameras; video surveillance storage devices; any electronic device capable of connecting to the camera

13

system, including but not limited to: cell phones, computers, tablets, and personal digital assistants; any trace evidence that would suggest an assault or struggle occurred."

77.     In the September 19, 2020, affidavit, Det. Sparks failed to include any information about the 45-minute interview which he and Officer Jenkins had conducted of Williams at JCPD headquarters that morning. Nor did Det. Sparks explain that he had permitted Williams to retain custody of his cellphone during the entirety of this interview.

78.     When JCPD officers returned with a search warrant at approximately 10 a.m. on September 19, 2020, they seized a number of digital devices from Williams' apartment, including four phones, four computers, and three memory cards.

79.     According to the Government's response, JCPD officers seized, among other items, video cameras which had been hidden in a closet under paper towels. The video surveillance cameras which officers had observed hours before in the apartment had all been taken down while JCPD had left the apartment unsecured.

80.     On information and belief, the digital devices seized on September 19, 2020, remained in the custody of JCPD for over two years without being properly searched for evidence.

81.     By information and belief, had JCPD officers properly secured, seized, and searched the digital evidence in Williams' apartment that night, they would have found evidence that Williams drugged Plaintiff and caused her fall.

82.     To date, no charges have been filed against Williams as a result of the attempted homicide investigation.

## CAUSES OF ACTION

### COUNT I
### Tennessee Governmental Tort Liability Act, T.C.A. § 29-20-205

14

83.     Plaintiff restates and incorporates herein the allegations in the above paragraphs.

84.     Before Plaintiff was pushed out of Williams' fifth-story apartment window, Defendants received numerous reports of women drugged and raped by Williams and failed to investigate, arrest, or charge Williams.

85.     Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks were aware of numerous complaints of sexual assault and drugging by Williams. Despite this knowledge, Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks failed to investigate Williams, refer all reports of his criminal activity to the District Attorney's Office, or provide protection for the Plaintiff in this case. These actions do not exercise the care that a reasonable or prudent individual in their capacities would hold. Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks' negligent actions were the proximate cause of the Plaintiff's injuries, including bodily injury, emotional distress, deprivation of property, and economic harm. Had Defendants properly investigated Williams after any of the reports made against him prior to the incident involving Plaintiff, she would not have suffered the injuries alleged in this case.

86.     When Plaintiff was pushed out of Williams' fifth-story apartment window, Defendants intentionally failed to investigate Williams.

87.     Defendants intentionally failed to preserve the video surveillance cameras found in or near Williams' apartment when Plaintiff was pushed out of Williams' window and intentionally failed to preserve the evidence on Williams' cell phone.

88.     Defendants intentionally failed to prevent Williams from destroying evidence on his cell phone while in police custody after Plaintiff fell out of Williams' window by not seizing Williams' cell phone before he was left alone in the interrogation room.

15

89.     Defendants intentionally failed to block off Williams' apartment while waiting for a warrant to begin searching the apartment, and as a result, Defendants intentionally failed to prevent Williams and others from re-entering his apartment and removing or destroying evidence.

90.     Defendants failed to test Plaintiff for date rape drugs and failed to complete a rape kit.

91.     Defendants intentionally delayed emailing Plaintiff her toxicology report until after the blood was destroyed.

92.     Defendant City is liable for the injuries proximately caused by the negligent acts or omissions of Chief Turner, Captain Peters, Investigator Higgins, and Investigator Sparks in failing to investigate Williams prior to the incident involving Plaintiff. Johnson City is liable for the police officers' acts of destroying the evidence against Williams and the omission of failing to preserve the evidence and failing to investigate Williams both before and after the incident involving Plaintiff.

## COUNT II
## Civil Conspiracy

93.     Plaintiff restates and incorporates herein the allegations in the above paragraphs.

94.     Defendants intentionally conspired together, conspired with Williams, and conspired with Williams' other co-conspirators by agreement and understanding to further Williams' acts, destroy evidence against Williams, and obstruct the investigation into Williams for years, including Williams' acts against Plaintiff on September 19, 2020.

95.     Williams paid Defendants weekly not to investigate Williams per the Plaintiffs' Opposition in Response to a Motion to Quash in the Class Action case filed by Williams' victims (*Jane Does 1-9 v. City of Johnson City, Tennessee, et al.*, 2:23-cv-00071-TRM-JEM, Doc. No. 190). While at Williams' apartment on September 19, 2020, Defendants took Williams' safe, which kept

16

$500,000. When the safe was returned to Williams, only $81,000 was left per the Class Action Complaint, ¶ 86. Defendants likely took the money as payment for not investigating Williams for his actions on September 19, 2020.

96.     Defendants intentionally and purposefully did not collect evidence against Williams, did not review seized evidence from Williams' apartment, and did not investigate Williams further after Plaintiff was pushed out of Williams' window because they conspired with and received payment from Williams.

97.     As a result of Defendants receiving the bribe and failing to investigate, arrest, or charge Williams, Williams continued his crimes, drugged Plaintiff, and pushed her out of his apartment window resulting in life-threatening injuries to Plaintiff.

## COUNT III
## Fraudulent Concealment

98.     Plaintiff restates and incorporates herein the allegations in the above paragraphs.

99.     Defendants intentionally concealed information from Plaintiff. Defendant Sparks intentionally withheld Plaintiff's toxicology report until after Plaintiff's blood was destroyed. Defendants intentionally did not review the surveillance cameras in and around Williams' apartment despite knowing of their existence.

100.    Plaintiff could not have obtained the toxicology report or the video surveillance from Williams' apartment by any other means than through Defendants because both were in Defendants' custody or control.

101.    Defendant Sparks had knowledge of the facts because Defendant Sparks was one of the lead investigators on Plaintiff's fall on September 19, 2020. Defendant Sparks was aware of the surveillance cameras in and around Williams' apartment. Defendant Sparks was aware of the

toxicology report because he received it a year prior to emailing the report to Plaintiff. Sparks intentionally waited until four months after the blood was destroyed to send it to Plaintiff. The lab provided Sparks with the date that the blood would be destroyed on the toxicology report.

102.    Defendant Sparks knew Plaintiff's blood would be destroyed when he received the toxicology report. Defendant Sparks intentionally emailed the toxicology report to Plaintiff four months after the blood was destroyed.

**COUNT IV**
**Equal Protection, 42 U.S.C. § 1983**
**Unconstitutional Pattern and Practice as to Women Reporters**

103.    Plaintiff restates and incorporates herein the allegations in the above paragraphs.

104.    Defendants failed to investigate Plaintiff's incident and failed to investigate Williams.

105.    Defendants failed to preserve evidence collected against Williams.

106.    Defendants failed to prevent Williams from destroying evidence on his cell phone while in police custody.

107.    Defendants failed to obtain and preserve the video surveillance cameras found at Williams' apartment.

108.    Defendants failed to investigate the digital devices seized at Williams' apartment before they could be destroyed by Williams.

109.    Defendants allowed Williams to destroy and alter evidence on his cell phone while in police custody.

110.    Defendants accepted weekly bribes of $2,000 or more from Williams' shell companies and did not investigate Williams' crimes for years because of the bribe.

111.    As a result, Defendants recklessly disregarded Plaintiff's equal protection rights because of Defendants' acceptance of bribes and persistent and widespread denial of law enforcement services.

112.    Plaintiff suffered economic harm, bodily injury, and emotional distress because Defendants allowed Williams to continue his acts against women.

**COUNT V**
**Equal Protection, 42 U.S.C. § 1983**
**Violation of Substantive Rights to Due Process**

113.    Plaintiff restates and incorporates herein the allegations in the above paragraphs.

114.    The Defendants' aforementioned actions, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, Investigator Higgins, and Investigator Legault, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Plaintiff with a purpose to harm that was unrelated to any legitimate law enforcement objective.

115.    Defendants' actions caused an increased risk to Plaintiff and exposed Plaintiff to an act of violence by a third party.

116.    By receiving a bribe from Williams and failing to investigate, arrest, and charge Williams, Defendants exposed Plaintiff to the injuries she sustained on September 20, 2020.

117.    Defendants' conduct was willful, knowing, wanton, malicious, and conducted with reckless disregard for Plaintiff's rights and safety. As a result, Plaintiff was deprived of her equal protection rights.

118.    As a direct and proximate result of Defendants' actions, Plaintiff suffered extreme pain and injury in the form of economic harm, bodily injury, and emotional distress.

19

## COUNT VI
## Intentional Infliction of Emotional Distress

119.    Plaintiff restates and incorporates herein the allegations in the above paragraphs.

120.    Not only did Defendants intentionally and recklessly disregard Plaintiff's case by failing to investigate, arrest, or charge Williams but Defendants intentionally destroyed relevant evidence in their custody and control.

121.    Defendant Sparks intentionally withheld the toxicology report from Plaintiff until after Plaintiff's blood was destroyed by the lab. During the time Defendant Sparks had the toxicology report, Plaintiff continued to call Defendant Sparks for updates and copies of all relevant documents available. However, Defendant Sparks intentionally did not disclose and withheld the toxicology report for months.

122.    Defendants intentionally allowed Williams to keep and use his cellphone in their custody. By allowing Williams to keep his cellphone while in Defendants' custody, Williams destroyed video surveillance showing Plaintiff being pushed out of William's window. Defendants knew this evidence was critical for future legal proceedings. Otherwise, the video surveillance would not have been destroyed.

123.    Defendants' intentional and reckless actions by choosing not to investigate, arrest, or charge Williams for his crimes, and intentional destruction of evidence including evidence of Williams pushing Plaintiff out a five-story window, in exchange for bribes is extreme and outrageous and not tolerated by civilized society.

124.    As a result of Defendants' intentional and reckless actions during the investigation of Plaintiff's fall, Plaintiff has suffered and continues to suffer from emotional distress.

125.    Defendants knew or should have known that their intentional actions during the investigation of Plaintiff's case would cause Plaintiff emotional distress.

20

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays of this Court as follows:

1.  Enter judgment against Defendants and in favor of Plaintiff;

2.  Award compensatory damages for physical injuries, medical bills, emotional distress, pain and suffering, and all compensatory and economic damages caused by the actions of Defendants;

3.  Award punitive damages;

4.  Award reasonable attorney's fees and costs;

5.  Pre-judgment and post-judgment interest;

6.  Any other relief and award to which Plaintiff may be entitled; and

7.  Any other relief and award the Court deems just and proper.

Respectfully submitted on this 20 day of June 2024.

/s/Ashleigh Beer-Vineyard
Bob Dziewulski (BPR # 037044)
Ashleigh Beer-Vineyard (BPR # 038399)
**DZ Law, PLLC**
800 South Gay St., Ste. 2131
Knoxville, TN 37929
(865) 259-0020
bobdz@dzlaw.co
ashleighbeer@dzlaw.co

*Attorneys for Plaintiff*

21

## COST BOND

The undersigned are principal and surety for all costs and taxes in the manner and to the extent prescribed by law.

Mikayla Evans, Principal


*/s/Ashleigh Beer-Vineyard*
DZ Law, PLLC, Surety