# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# GREENEVILLE DIVISION

| | |
|---|---|
| MIKAYLA EVANS, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) Case No.: 2:24-cv-00106 |
| | ) |
| v. | ) |
| | ) |
| JOHNSON CITY, a government entity, | ) **JURY TRIAL DEMANDED** |
| | ) |
| KARL TURNER, individually and in his official capacity as Chief of Johnson City Police Department, | ) |
| | ) |
| KEVIN PETERS, individually and in his official capacity as Captain of the Johnson City Police Department, | ) |
| | ) |
| TOMA SPARKS, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) |
| | ) |
| JUSTIN JENKINS, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) |
| | ) |
| JEFF LEGAULT, individually and in his official capacity as Investigator of the Johnson City Police Department, | ) |
| | ) |
| BRADY HIGGINS, individually and in his official capacity as Investigator of the Johnson City Police Department, and | ) |
| | ) |
| DOES 8-20, inclusive, | ) |
| | ) |
| *Defendants.* | ) |

1

<u>**PROPOSED THIRD AMENDED COMPLAINT**</u>

Plaintiff MIKAYLA EVANS ("Plaintiff" or "Mikayla"), by and through her undersigned counsel, for her Third Amended Complaint against defendants JOHNSON CITY, KARL TURNER, KEVIN PETERS, TOMA SPARKS, JUSTIN JENKINS, JEFF LEGAULT, BRADY HIGGINS, AND DOES 8-20 (collectively as "Defendants" or "Defendant-coconspirators"), alleges, on knowledge as to her actions, as follows:

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

1. Plaintiff is domiciled in Tennessee and a resident of Sullivan County, Tennessee.

2. Defendant Johnson City, Tennessee, ("Defendant City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. Defendant City has substantial control over the Johnson City Police Department and its employees.

3. Defendant Chief Karl Turner is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

4. Defendant Captain Kevin Peters is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

5. Defendant Investigator Toma Sparks is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

6. Defendant Investigator Justin Jenkins is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

7. Defendant Investigator Jeff Legault is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

8. Defendant Investigator Brady Higgins is an individual residing in Washington County, Tennessee, and was employed by Defendant City during the operative time.

2

9. Defendant Officers John Does 8 through 20 are Johnson City Police Officers. Plaintiff names them as "Doe" Defendants with the expectation that their identities will be ascertained after reasonable discovery.

10. Plaintiff alleges that each of the Defendants is responsible individually and as an agent, contributor, and co-conspirator in a single enterprise with and as the alter ego of all other Defendants.

11. At all relevant times, the unlawful conduct against Plaintiff as described herein was actuated, in whole or in part, to serve Defendants. At all relevant times, the unlawful conduct described herein was committed under actual or apparent authority granted by Defendants such that all of the unlawful conduct of all Defendants is legally attributable to all other Defendants.

12. At all relevant times, Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described herein, unless otherwise indicated, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

13. Plaintiff brings this action pursuant to the Tennessee Governmental Tort Liability Act and Tenn. Code Ann. § 29-20-205; 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution; and the common law.

14. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

15. Venue is proper under 28 U.S.C. § 1391 as Defendants are located in Washington County, in the Greeneville Division of the Eastern District of Tennessee.

## FACTUAL ALLEGATIONS

**A.     Introduction.**

16.     Beginning in 2018 and continuing to his eventual incarceration, Sean Williams ("Williams"), with the aid of Defendants, conspired with Alvaro Fernando Diaz-Vargas and others to drug, assault, and sexually exploit women and minors, in his downtown Johnson City apartment. Defendants not only allowed Williams to "get away" with his crimes but actively helped him conceal and destroy evidence, preventing his arrest.

17.     Until fleeing from arrest on May 5, 2021, Williams lived in a fifth-floor apartment located in downtown Johnson City. Williams operated Glass and Concrete Contracting, LLC ("GCC"), along with his accomplice Diaz-Vargas. GCC had an annual revenue in the millions of dollars. Williams and others used GCC, as a front to buy and sell narcotics, as well as to funnel money to JCPD through Brady Higgins ("Higgins"), Toma Sparks ("Sparks"), Justin Jenkins ("Jenkins"), Jeff Legault ("Legault"), Kevin Peters ("Peters"), and Karl Turner ("Turner") (collectively "Officer Defendants") in exchange for protection from investigation.

18.     Williams developed a modus operandi by which he attracted, drugged, and raped women.

19.     First, he would meet young women often using the aid of young male associates to identify the women. Williams then would offer the women alcohol and/or illegal drugs to entice them to come to his apartment and/or his garage. Williams would lace the alcohol and/or drugs offered to these women with common date rape drugs and other substances with the intent to incapacitate the women.

20.     Once the women consumed the intoxicants provided by Williams they would pass out. After the women regained consciousness, they would discover they'd been sexually assaulted. Williams rewarded his accomplices with drugs, money, and other favors. Williams

kept drugs and alcohol designated for women and male accomplices. The drugs designated for women would be laced with mind-altering and inhibition-lowering substances, while the drugs and alcohol designated for his male accomplices were untampered with.

21. Williams would even hire people to help him organize parties in his apartment for the purpose of identifying future victims. One such person, Caleb Harless was offered "extracurriculars" or women, in lieu of cash for helping Williams plan a party in his apartment.

22. Williams had a reputation in Johnson City for being a "creep" and taking advantage of young women. In fact, in January of 2021, an unidentified individual spray painted "Rapist" on the side of Williams' garage.

23. Williams was allowed to continue his pattern of criminal behavior without consequences by bribing Officer Defendants working for the Johnson City Police Department to prevent investigations and/or to cover up evidence of his crimes.

24. Williams has an extensive criminal record from 1989-2004. Except for a few North Carolina criminal charges in 2009 and 2013, Williams' criminal record drastically declines once he moved to Johnson City in late 2004 likely because of his conspiratorial relationship with Officer Defendants manifested through illegal bribes.

25. As furtherance of Defendants' conspiracy, Officer Defendants accepted a weekly bribe of at least $2,000.00 from Williams' accomplice(s). Officer Defendants also willfully ignored reports, intimidated and belittled the victims, including Plaintiff, and discouraged pursuit of legal remedies against Williams despite awareness of his crimes because of Williams' weekly bribes and an illegal prejudice against female victims.

**B.    JCPD knew Williams was a serial rapist.**

26.    On November 7, 2019, a woman identified herein as Jane Doe 3 was in Williams' apartment and began to feel mentally and physically incapacitated. Jane. Doe 3 woke up in Williams' bed with Williams on top of her. She pushed him off and escaped. Once she escaped Williams' apartment, she asked a friend to drive her to urgent care to receive a rape kit.

27.    Once at urgent care, Jane Doe 3 told staff that she wanted to report a rape. JCPD officers responded and when Jane Doe 3 identified Williams as the man who raped her, they told her that they had received complaints of sexual assault against Williams in the past.

28.    Jane Doe 3 told JCPD she wanted to press charges. She heard nothing from JCPD for a year and a half until Defendant Sparks called her with the results of her rape kit and toxicology report. Despite showing that she had likely been drugged and raped, Defendant Sparks tried to dissuade Jane Doe 3 from pursuing charges. Defendant Sparks described Williams as "untouchable" and lied to Jane Doe 3 about JCPD's ability to get a DNA sample from Williams. Defendant Sparks also told Jane Doe 3 that JCPD could "probably not" protect her if she did report the rape.

29.    As a final point of dissuasion, Defendant Sparks told Jane Doe 3 that he was unsure if he could do anything to apprehend Williams even if she did want to press charges.

30.    After a couple of days, Jane Doe 3 despite Defendant Sparks' best efforts decided to pursue charges. Jane Doe 3 called Defendant Sparks to let him know that she wished to pursue charges against Williams. After this phone call, Jane Doe 3 did not hear back from Defendant Sparks. As far as Jane Doe 3 was concerned, JCPD was not investigating her report.

31.    However, on June 1, 2023, over four years after the rape and after Kateri Dahl filed suit and just two weeks before the Does filed their complaint, Defendant Sparks wrote a search warrant

6

for Williams' DNA as part of the criminal investigation in Jane Doe 3's rape. Sparks never communicated with Jane Doe 3 regarding this warrant. On June 23, 2023, JCPD stopped all further work on Jane Doe 3's investigation to "avoid any possible appearance of impropriety."

32. To date, no charges have been brought against Williams for the rape of Jane Doe 3.

33. In June of 2020, a woman identified herein as Jane Doe 4 reported Williams had raped her. To date, no charges have been brought in relation to this case either.

34. On November 13, 2020, Sparks approached SAUSA Kateri Dahl about indicting Williams on a felon in possession of ammunition charge. When Dahl explained that per USAO policy that cases for ammunition were usually only prosecuted federally if there was a compelling reason, Sparks told Dahl that Williams was a suspected serial rapist. Though JCPD knew Williams was an alleged serial rapist they failed to test Plaintiff for common date rape drugs, despite knowing drugs, that were not voluntarily taken by Jane Doe 3, were found in her system.

35. In the same conversation Sparks explained how Williams had a history of assault reports, and that JCPD found disturbing items in Williams' home including a "Raped" list and a baby doll with a hole cut into its privates. Sparks explained that Williams was known to lure women from his garage to his apartment and drug them. He explained that Williams had cameras in his apartment and would blackmail victims to silence them. Sparks even told Dahl how Williams was allowed to wipe his phone.

36. Dahl was disturbed by what she was told and believed that JCPD had probable cause to get a warrant to search the camera SIM cards confiscated from Williams' apartment. Dahl asked Sparks to draft a search warrant and to send her Williams' case file. Dahl did not receive either until months later. The search warrant drafted by Sparks was wholly insufficient. Sparks

7

intentionally delayed this attempt to collect evidence against Williams in hopes that Dahl would see the deficiencies in the search warrant and decide not to attempt to search Williams' cameras.

37.     On November 20, 2020, a Johnson City woman identified herein as Jane Doe 1, was hanging out in Williams' garage when he offered her alcohol and cocaine. She declined the alcohol and took the cocaine. She immediately became drowsy. Williams offered his bed for her to rest in and her next memory is of being raped by Williams.

38.     The next day, after fleeing Williams' apartment Jane Doe 1 reported the assault to the Federal Bureau of Investigation ("FBI") instead of Johnson City Police Department ("JCPD") because she did not trust JCPD to take the assault seriously.

39.     The FBI agent Jane Doe 1 spoke to called Sparks to come to the FBI office and talk with Jane Doe 1. Sparks took Jane Doe 1 to the hospital where she received a rape kit. Sparks took Jane Doe 1 to JCPD offices and interviewed her. Sparks told Jane Doe 1 that she was the first woman to want to pursue charges against Williams and that the rest were too scared. Sparks was attempting to scare Jane Doe 1 out of pursuing charges. Jane Doe 1 never received the results of her rape kit.

40.     In August 2023, videos of Williams' assault on Jane Doe 1 were uncovered. To date, no charges have been brought against Williams for his assault of Jane Doe 1.

41.     In October 2020, a woman identified herein as Jane Doe 2 was at a party in Williams' apartment when Williams offered her a drink. Shortly after she started drinking, she lost consciousness. When Jane Doe 2 woke up she was partially naked, and Williams was sleeping on the couch next to her.

42.     The next day, Jane Doe 2 called the Tennessee Department of Health to report that she had been raped and needed to be examined. On October 23, 2020, she received a rape kit and was given Sparks' number to report the assault by Williams.

8

43. Jane Doe 2 called Sparks and reported the assault. Sparks encouraged Jane Doe 2 to wait until the rape kit results came in before she made a police report. Jane Doe 2 placed two more calls in the coming days to Sparks to make a report. She never received her rape kit results.

44. In August 2023, Jane Doe 2 discovered that Williams had taken a video of his assault on her. To date, no charges have been brought against Willliams for his assault on Jane Doe 2.

45. Despite these reports and countless others, JCPD failed to arrest Williams and charge him with a single assault.

46. In December 2019, Dahl discovered the existence of Jane Doe 4 and her allegations against Williams. JCPD had actively concealed this report from Dahl. December 2019 is also the first time Dahl is shown Jane Doe 4's rape kit results. The results showed the presence of male DNA. Though this report was completed in July 2019, neither Dahl nor Jane Doe 4 was told the results until December 2019 despite the report being in Sparks' possession and Dahl being actively involved in an investigation of Williams.

47. Dahl reached out in June 2019 to the victim identified as Jane Doe 4. Though JCPD records indicated that she was "uncooperative" she agreed to come to JCPD offices and meet with Dahl. Dahl, Sparks, and former Johnson City SAUSA Tom McCauley were present for the interview, Sparks led it.

48. Following the meeting, McCauley approached Dahl and expressed concern. At some point during his visit to JCPD, Peters showed McCauley pictures of Jane Doe 4 on her Facebook and made derogatory remarks about her appearance. McCauley was concerned that his behavior was a symptom of a discriminatory bias against female victims of sexual assault.

9

**C.      Plaintiff is Drugged and Falls from Williams' Penthouse Window.**

49.      On September 19, 2020, Plaintiff was out in downtown Johnson City with a couple of friends. Plaintiff had consumed a couple of beers but was not intoxicated. She was supposed to meet her friend Albert Watts at the downtown Johnson City bar Wonderland Lounge and Grill.

50.      While waiting for Albert at Wonderland, Albert texted Plaintiff and told her he could not find the bar. Plaintiff was confused by this, as she believed Albert had been to Wonderland in the past and she had provided him with simple yet detailed instructions on how to get there.

51.      Nevertheless, Plaintiff decided she would meet Albert and walk with him to Wonderland. When Plaintiff walked down the street outside of Wonderland she found Albert standing outside of William's garage watching Williams and two individuals partying inside.

52.      Once Plaintiff walked up to Albert, she noticed loud music and lights coming from the garage and mentioned to Albert that it looked like a fun time.

53.      Plaintiff then heard a voice from inside the garage say "come on in." After further encouragement from Albert, the two of them entered Williams' garage.

54.      Plaintiff alleges that Albert knew Williams or at the very least knew of Williams and believed that if he brought Plaintiff to party with Williams, he would provide Albert with cocaine.

55.      Within twenty minutes of arriving at the party, Plaintiff began feeling the effects of a drug, and her speech began to slur.

56.      Shortly after, Williams invited Plaintiff and Albert to his apartment across the street. Though Plaintiff has no memory of entering Williams' apartment, surveillance footage shows Plaintiff, Williams, and Albert entering Williams' apartment.

57.      At approximately 2:34 a.m., Williams attempted to sexually assault Plaintiff and during this altercation, pushed Plaintiff out of his five-story apartment building window. Soon after

10

Plaintiff was pushed, and before he could speak to law enforcement, Albert fled the scene. Williams was seen by an eyewitness in a struggle with Plaintiff before her fall, Williams had his right hand on Plaintiff's left shoulder, and his left hand on her lower right hip area. The two struggled for 5-6 seconds before Williams pushed Plaintiff out the window.

58. After the police located Albert at his home, he told law enforcement that he went to Williams' apartment for a drink. However, Albert later admits to Plaintiff that the purpose of going to Williams' apartment was to do cocaine.

59. When JCPD arrives on the scene, Williams is found with his hands covered with blood up to his wrists.

60. In Williams' apartment there were cameras facing the very window Plaintiff fell from.

61. Plaintiff was admitted to the hospital and underwent multiple surgeries. Plaintiff's injuries included pelvic fracture, humeral fracture, radius fracture, dislocated elbow, calcaneus fracture, talar neck fracture, multiple metatarsal fractures, fabular avulsion, navicular fracture, calcaneus fracture, fibula fracture, cuneiform fracture, cuboid fracture, multiple facial and skull fractures, and multiple lumbar fractures. Upon admission to the hospital, Plaintiff was intubated because she was in respiratory failure.

62. Plaintiff was discharged from the hospital on October 16, 2020. However, Plaintiff was bedridden and unable to care for herself until the summer of 2022.

63. At the hospital, despite Plaintiff's insistence that she believed she was drugged and assaulted, JCPD did not allow Plaintiff to be tested for date-rape drugs. Plaintiff's rape kit was not properly administered.

64. Plaintiff's blood was sent to the crime lab for analysis, but Plaintiff did not receive the toxicology report until about one year later at which point the blood was already destroyed.

11

65. Defendant Sparks and Defendant Peters received the toxicology report on or around January 19, 2021.

66. Defendant Sparks emailed the toxicology report to Plaintiff on or around January 20, 2022. The blood was destroyed on or around September 1, 2021.

67. Defendant Sparks intentionally withheld Plaintiff's toxicology report until after the blood was destroyed to prevent Plaintiff from requesting further testing that would have revealed the presence of date-rape drugs, all while continuously ensuring Plaintiff that an investigation into the incident was ongoing and intentionally allowing the statute of limitations for civil claims available to Mikayla to expire; thus, barring recovery from Williams.

68. Defendant Sparks escorted Williams to JCPD headquarters. Defendants Sparks and Jenkins interviewed Williams at JCPD headquarters. During the thirty-minute interview, Defendants Sparks and Jenkins allowed Williams to keep his cell phone which had access to the video surveillance cameras in his apartment. After the interview, Defendants Sparks and Jenkins left Williams alone with his cell phone.

69. Defendants Sparks and Jenkins knew that Williams' cell phone likely contained video evidence of Plaintiff's fall. Nonetheless, they allowed Williams to remain in possession of his phone. Sparks and Jenkins knew Williams would try to delete evidence off his cell phone and allowed him to do so.

70. While in custody, Williams manipulated his cell phone, made phone calls from his cell phone, and erased data from his cell phone. After this, Defendant Sparks seized Williams' cell phone and applied for a search warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

12

71. JCPD officers seized four phones, four computers, and three memory cards from Williams' apartment. These devices were not investigated or searched in the two years custody of JCPD.

72. Had Defendants Higgins, Legault, Turner, Peters, Sparks and Jenkins performed a fair and thorough investigation following Mikayla's fall in September 2020, they very likely would have found video evidence of the struggle leading to her fall.

73. Had Defendants Turner, Peters, Sparks and Jenkins performed a fair and thorough investigation following Mikayla's fall in September 2020 certainly would have found evidence of rape and sexual exploitation of minors.

74. Defendants' intentional conduct shocks the conscience.

**D.    Defendants Sabotage Dahl's Investigation of Williams.**

75. Defendants sabotaged Dahl's investigation of Williams, including but not limited to concealing victims and their information from Dahl.

76. On March 16, 2021, Legault and Peters, receive information on another alleged victim of Williams. They intentionally do not disclose this information to Dahl. This was not the only victim concealed from Dahl, she was also not informed about a victim who died on November 20, 2020, while driving home from Williams' apartment after being drugged.

77. On December 7, 2020, Turner with Peters help caused a meeting with Dahl and the TBI to discuss Williams' case to be canceled. The meeting was set up by Wayne Taylor, a Supervisory AUSA in the Greenville U.S. Attorney's Office. Taylor called Dahl and told her that Turner was upset about the meeting. Dahl was originally told that the meeting was cancelled due to COVID exposure but eventually realized that it was Turner and Peters who intentionally cancelled the meeting.

13

78.     Following the cancelled meeting, Turner asked Dahl to meet with him to discuss Williams. Dahl showed up to speak with Turner, who included Peters in the meeting. Dahl recorded the meeting for her safety. During the meeting, Turner and Peters cast doubt on the evidence Dahl had already collected, including the "Raped" list which Turner indicated may be a list Williams kept of women he had consensual sex with. Instead of helping Dahl with her investigation into Williams, Turner and Peters suggested installing pole cameras which were unlikely to capture evidence of a crime.

79.     Following the interview of Jane Doe 4, Turner called McCauley to make baseless complaints about Dahl.

**E.      Sparks and Jenkins Profit from Williams' Crimes.**

80.     Mikayla's fall and near death was an unexpected inconvenience for JCPD. Covering up an alleged rape was one thing, covering up an attempted homicide posed a more difficult challenge for the conspirators.

81.     Turner discouraged Dahl from obtaining a warrant to inspect William's SIM cards and Sparks delayed sending Dahl a draft affidavit for months, finally emailing her a draft that was so deficient it would never support probable cause to secure a search warrant.

82.     Williams' digital devices stayed in JCPD custody for two and a half years without search.

83.     Despite the destruction of evidence implicating Williams in Mikayla's case, we now know evidence of Williams' crimes against others was accessible to the Defendants.

84.     Defendants' decision not to search William's SIM cards was intentional: the goal was to protect Williams, so that the corrupt scheme through which the officers had enriched themselves was destroyed.

14

85.     In return, and as payment, JCPD officers, including Sparks, Jenkins, Turner, Peters, Legault, Higgins, took hundreds of thousands of dollars in cash from Williams including cash and a gold necklace found in Williams' safe.

86.     Beginning on an unknown date and continuing until at least April 2023, Defendants conspired with Williams and Williams' other co-conspirators to further Williams' criminal acts, destroy evidence against Williams, and obstruct the investigation into Williams for years, including Williams' criminal acts against Plaintiff on September 19, 2020.

87.     Defendants Sparks and Jenkins engaged in behavior in actual and implied agreement with Williams and his coconspirators, particularly the individual identified herein as Female 4, to facilitate, allow, the victimization of Plaintiff and many others. JCPD, through the individual Defendants accepted money in exchange for protection from investigation and inevitable arrest.

88.     Defendants Sparks and Jenkins effectively accepted payments from Williams in furtherance of the conspiracy through the corrupt use of a search warrant for Williams' safe and other unlawful collection efforts.

89.     The warrant was, on its face, obtained and used to seize unlawfully obtained currency or narcotics assets. In fact, the seizure was a quid pro quo payment made to Sparks and Jenkins with either the implied or explicit understanding that, in exchange, they would shield Williams, permitting him to continue his practice of abuse uninhibited.

90.     Defendants Sparks and Jenkins knew or should have known that their participation in such a venture was for the purpose of facilitating and supporting Williams' sex crimes.

91.     Defendants Sparks and Jenkins took overt acts in furtherance of the conspiracy to protect Williams from arrest, allowing him to continue his crimes.

15

**F.      JCPD's Cover-Up Following Mikayla's Fall.**

92.      Defendants Sparks and Jenkins were the first JCPD officers on the scene the night of Mikayla's fall. As officers from the Criminal Investigations Division ("CID"), Defendants Sparks and Jenkins took control of the crime scene upon arrival at Williams' apartment, with the patrol officers looking to them for decision making.

93.      Defendants Sparks and Jenkins then proceeded to obstruct a meaningful investigation into Williams by ignoring JCPD protocol for securing and searching the scene of a crime.

94.      An investigation consistent with JCPD policies into William's attempted homicide was likely to reveal evidence of Officer Defendants' extortion scheme.

95.      Evidence obtained in the Doe case[1] shows Defendants Sparks and Jenkins had already been making deposits in cash and laundering payments through multiple bank and loan accounts which far exceeded their known sources of income for years, in exchange for refusing to investigate allegations made against Williams by his female victims. Accordingly, Defendants Sparks and Jenkins intentionally obstructed the investigation into Williams regarding Plaintiff's fall as well.

96.      For example, Defendants Sparks and Jenkins never tested Williams' bloody hands to determine whether this was Mikayla's blood or seek an explanation for the amount of blood on Williams' hands, despite having an open investigation into attempted homicide.

97.      Perhaps the most disturbing conduct was that of Defendants Turner, Peters, Sparks, and Jenkins when intentionally interfering with the lawful search of Williams' seized digital devices.  Williams' devices very likely contained video evidence of Mikayla's fall.

98.      These devices also contained evidence of Williams' raping women and sexually exploiting children (officers found a baby doll with a hole in her genitals inside of Williams' safe and a

---

[1] *B.P., et al. v. City of Johnson City, Tennessee, et al.*, No: 2:23-cv 00071-TRM-JEM (EDTN).

16

handwritten "Raped list" with dozens of names on his nightstand). Defendants Sparks and Jenkins, at the direction of Defendants Turner and Peters in their supervisory capacity, intentionally suppressed and destroyed evidence on Williams' digital devices, to cover up their own corruption.

99. At the direction of Defendants Sparks and Jenkins, JCPD officers left the apartment unsecured without seizing or securing the Arlo video cameras which pointed towards the window at the center of the room from which Mikayla fell.

100. Despite knowing that Williams was accessing the Arlo video camera footage remotely from his cell phone because Williams showed them, Defendants Sparks and Jenkins intentionally permitted Williams to maintain control of his phone, knowing William would be able to destroy evidence.

101. Defendants Sparks and Jenkins also failed to seize a handwritten note stating, "Call Arlo!!!" which could have been evidence of Williams' efforts to delete the video footage and obstruct justice. Officers seized the phone, which was found next to the note, and belonged to Plaintiff, but left the note.

102. Diaz-Vargas was present in Williams' apartment during the investigation. Defendants Sparks and Jenkins intentionally left Diaz-Vargas in the unsecured apartment alone while they brought Williams to JCPD headquarters, enabling Diaz-Vargas to destroy and conceal evidence.

103. Video footage shows that Jenkins was the last officer to interact with Diaz-Vargas before all the JCPD officers left that morning. Surveillance video from Williams' apartment shows Jenkins pause and watch as Diaz-Vargas turns and re-enters Williams' apartment. Only then does Defendant Jenkins turn and walk down the stairs.

104. Defendant Peters was aware of the actions Defendants Sparks and Jenkins took on September 19, 2020, to obstruct the investigation into Williams. Call logs produced in the Doe

17

case show that David Hilton, the CID supervisor on scene, called Defendant Peters three times between 4:37 a.m. and 5:40 a.m., for six minutes, four minutes, and two minutes, respectively.

105. Defendant Peters continued to receive regular updates from Hilton throughout the day, including while Hilton, Defendant Sparks, Defendant Jenkins, and Keith Sexton were executing a search warrant for Williams' apartment. For instance, Defendant Peters spoke to Hilton for four minutes at 11:28 a.m. and fourteen minutes at 3:05 p.m. According to dispatch logs, Hilton was at Williams' apartment from 10:42 a.m. to 4:19 p.m.

106. Once at JCPD headquarters, Defendants Sparks and Jenkins placed Williams in an interview room. For the next 30 minutes, while Defendant Jenkins interviewed him—and then left him alone in the room—Williams maintained custody and control of his cell phone. Williams continued to manipulate his cell phone and made phone calls from his cell phone during this time.

107. By the end of the interview, Williams was able to erase all the data from his cell phone, including evidence of Plaintiff in his apartment. Only then did Defendant Sparks seize Williams' cell phone and apply for a search warrant for Williams' apartment.

108. During this time, Williams' apartment was left unsecured, and Diaz-Vargas was able to move and/or destroy evidence. By the time Defendants Sparks and Jenkins returned with a search warrant for Williams' apartment later that morning, Diaz-Vargas had taken down the video cameras and hid them in a closet under a pile of paper towels.

109. At 8:52 a.m. on September 19, 2020, Sparks applied for a warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide, as part of the investigation into Mikayla's fall from Williams' window.

110. Beginning at 10:08 a.m., JCPD officers Defendant Jenkins, Defendant Sparks, Hilton, and Sexton executed the search warrant on Williams' residence. According to dispatch logs produced

18

in the Doe case, Defendants Sparks and Jenkins remained at Williams' apartment for the next nine hours, leaving at 7:44 p.m.

111. Rather than conduct a thorough search according to JCPD protocol, however, Defendants Sparks and Jenkins intentionally chose not to secure, seize, and inventory key pieces of evidence.

112. Instead, they seized Williams' safe, which contained hundreds of thousands of dollars in cash and a gold Cartier necklace. This was part of either an implied or explicit understanding with Williams as part of their conspiracy.

113. Throughout the time that Defendants Sparks, Jenkins, Hilton, and Sexton were executing the search warrant in Williams' apartment on September 19, 2020, Defendant Peters was receiving regular updates from Hilton. Call logs show Hilton called Defendant Peters for four minutes at 11:28 a.m. and fourteen minutes at 3:05 p.m.

114. Additionally, Defendants Sparks and Jenkins intentionally failed to secure, seize, and inventory a rifle located just inside Williams' front door in plain view, despite knowing that Williams was a felon.

115. Defendants Sparks and Jenkins also failed to seize and inventory a handwritten note from Williams' nightstand with the word "Raped" written atop a list of twenty-three (23) female names, including names which appeared to describe children or babies.

116. Defendants Sparks and Jenkins waited in Williams' apartment for additional JCPD officers to arrive with a dolly to cart out the large safe. The safe had no evidentiary value in Mikayla's attempted homicide case, was not an item for which the officers had probable cause based on the search warrant and was only seized because Defendants Sparks and Jenkins had an agreement with Williams that they would obtain cash and other things of value from inside.

117. Williams himself has accused JCPD of stealing money from his safe.

19

118. Defendants Sparks and Jenkins also seized several digital devices belonging to Williams. The devices seized on September 19, 2020, remained in the custody of JCPD unlawfully for over two years without being properly searched for evidence.

119. If JCPD had secured and searched these digital devices before Williams could delete evidence, they would have seen evidence of Mikayla being drugged and forced out of Williams' window.

120. Defendants Sparks and Jenkins did not arrest Williams before leaving on September 19, 2020.

121. The devices seized on September 19, 2020, remained in the custody of JCPD unlawfully for over two years without being properly searched for evidence.

122. To date, the attempted homicide investigation has yielded no charges against Williams.

123. On or around August and September 2023, Williams began posting messages to Facebook through a female coconspirator. According to the posts, Williams wrote these statements himself from jail, using a contraband cell phone to send them to his coconspirator who would then post them to his Facebook page. This female coconspirator is identified in the Doe case and herein as Female 4.

124. On or about September 2, 2023, Williams wrote a message describing an extortion scheme involving JCPD officers. According to the post, beginning on an unknown date, and continuing until at least September 2020, JCPD officers, including Defendant Sparks, extorted cash from Williams through his coconspirator, Female 4, at the rate of at least $2,000.00 per week.

125. To facilitate the extortion scheme, Williams' company GCC used false Internal Revenue Service ("IRS") 1099 Forms to pay the money out of the business. Williams' coconspirator then

20

made "owner draws" from these separate business entities to obtain the cash to pay the JCPD officers.

126. The payments were paused in September 2020, following Williams' attempted murder of Mikayla because Defendant officers were concerned that an attempted homicide investigation would reveal their corruption.

127. As set forth in detail below, neither Defendants Sparks nor Jenkins ever secured a search warrant for the digital devices seized on September 19, 2020, even though this was the evidence sought by the original residence warrant.

128. Instead, within days, Defendant Sparks had applied for and obtained a second search warrant to search Williams' safe, purportedly for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide. There was no legitimate investigative purpose for securing this warrant—Defendants Sparks and Jenkins were investigating an attempted homicide that had no connection to possible narcotics stored in the safe. The real purpose behind obtaining this warrant was to unlawfully convert Williams' cash into their possession.

129. In support of this search, Defendant Sparks explained that a narcotics-trained police canine had alerted them to the safe for the presence of narcotics. Defendant Sparks applied to seize, among other items, "any currency" found in this safe.

130. After finding several bags of cash within the safe, the cash was not inventoried, and further investigation was ever conducted even though Defendant Sparks found the only possible evidence they could be searching for when applying to seize "any currency."

131. There were no facts stated in Defendant Sparks' warrant which connected "any currency" with the offense under investigation, the attempted homicide of Plaintiff, or showed how "any

21

currency" was evidence or fruits of this crime. The warrant therefore lacked probable cause to justify seizure of "any currency."

132. Although Diaz-Vargas, Williams, and/or other coconspirators had time to move and/or destroy other evidence in Williams' apartment, they left hundreds of thousands of dollars in cash in the safe which JCPD officers seized.

133. According to Sean Williams himself, he kept a large amount of cash in that safe and half of the currency was taken by the officers executing the warrant on the safe.

134. JCPD officers also took a Cartier gold necklace from the safe, never inventorying the necklace and never returned it to Williams. JCPD officers also found, but did not inventory, a girl baby doll which had a hole in the genitals area and two dildos.

135. In exchange for the cash and gold necklace, Defendants Sparks and Jenkins seized and illegally took from Williams, there was an agreement that they would undertake overt acts in furtherance of a conspiracy with Williams, to destroy evidence against Williams, and obstruct the investigation into Williams, allowing Williams to continue to sell illegal drugs and sexually exploit women and children for profit.

136. By the time Defendants Sparks and Jenkins took cash and other items of value from Williams' safe, they knew or should have known that these acts were in furtherance of Williams' crimes, if for no other reason based on the evidence they observed in Williams' apartment (the "Raped" list), the evidence found in the safe (the Baby doll), and the overwhelming evidence of Williams' sex crimes which was contained on the digital devices which they seized but intentionally did not search.

137. Defendant Sparks knew the cameras and the SIM cards contained damning evidence. While Williams was still a fugitive from justice hiding in North Carolina, Defendant Sparks attempted to

22

surrender the cameras and SIM cards to his attorney. Dahl had to step in and prevent this evidence from being handed over.

**G.      Defendants Intervene in a Federal Corruption Investigation.**

138.    Resulting from mounting public outcry, in August 2023, the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") opened a federal corruption investigation into JCPD's potential officer misconduct related to Sean Williams. This investigation is ongoing.

139.    Former federal prosecutor Kateri Dahl filed a civil complaint against Johnson City on June 23, 2022, revealing JCPD's systemic and pervasive practice of facilitating and ignoring acts of sexual violence, including rapes of adults and minors, and drug activity by Williams and his accomplices.

140.    Complaints made by Williams' victims alerting JCPD to Williams' crimes were ignored and, in several cases, the victims were persuaded not to continue their efforts seeking justice.

141.    JCPD personnel, including Defendants then-Chief Karl Turner, then-Captain Kevin Peters, Investigator Sparks, Investigator Jenkins, and Investigator Jeff Legault, affirmatively refused to investigate Williams' crimes against women including Plaintiff; affirmatively refused to refer charges for prosecution and referred charges in a piecemeal and incomplete manner to undermine potential prosecution; knowingly conspired to destroy and conceal evidence, including evidence of Williams' rapes; knowingly intimidated and dissuaded women from pursuing criminal charges; and, in the case of Investigator Sparks, knowingly made false statements to women with the intent to obstruct and interfere with criminal investigations. To this day, JCPD has never arrested or charged Williams.

142.     Defendants Turner, Peters, Sparks, and Legault also intentionally interfered with Dahl's efforts to investigate Williams' sex trafficking venture, conspiring to terminate her contract under false pretenses to stop her investigation.

143.     As revealed by text messages obtained in the Doe case, then DA Elect Finney, Peters and Turner attended a meeting on August 23, 2022. This meeting occurred to strategize an organized response to Dahl's allegations which would hide evidence of corruption and prevent the discovery of Defendants' corrupt scheme to protect Williams for financial gain.

144.     The next day on or about August 24, 2023, former Johnson City mayor  Cathy Ball ("Ball") and Defendant Turner penned a letter addressed to the outgoing DA, Kenneth Baldwin, asking his office or the Tennessee Bureau of Investigation (TBI) to perform a preliminary investigation to determine whether any basis exists to open a public corruption investigation into the allegations of former SAUSA Kateri Dahl ("Dahl Complaint"). DA Elect Finney, was copied on the letter. This letter came almost a full year after Dahl's Complaint was filed in June of 2022.

145.     On September 1, 2022, on his first day in office Finney responded to the letter from Ball and Turner explaining that there is no such thing as a "preliminary investigation," and that he did not have "enough information to request a TBI investigation at this point."

146.     Ball forwarded Finney's letter to the Johnson City Commissioners, claiming that Finney did not have enough information to move forward, and a local news station would report on the case that evening.

147.     Ball and Defendant Turner intentionally delayed the inquiry into the internal corruption investigation because they knew Finney would not approve an investigation.  Accordingly, they waited until Baldwin was in his last weeks as DA to take any steps to initiate an investigation.

148.    On August 30, 2023, Finney officially requested that the TBI open a "theft" investigation into JCPD officers opening of Williams safe, listing Williams as the "victim." This investigation, however, was merely an attempt to interject into the federal corruption investigation into JCPD.

149.    By September of 2023, Finney's "theft" investigation had become a joint state-federal investigation alongside and within EDTN's public corruption investigation into JCPD, allowing Finney access to, and direct control over, the federal corruption investigation.

**H.      Defendant Sparks Buys Female 4's Silence.[2]**

150.    Evidence obtained through discovery in the Doe case ties Sparks to a $14,000 payment made to Female 4 in January 2024. As set forth below, this payment was a bribe intended to buy Female 4's silence in the public corruption investigation and ensure she would not inculpate Defendant Sparks or other JCPD officers through her testimony in this case.

151.    Sometime during the Fall of 2023, as part of this investigation, TBI Investigator Gerald Ray interviewed Female 4. By then, Williams' Facebook post had named Female 4 as the coconspirator who provided cash to Defendant Sparks and other JCPD officers as part of the extortion scheme.

152.    On November 16, 2023, Defendant Sparks was interviewed by FBI and TBI agents as a potential target in the federal public corruption investigation.

153.    Thus, by November 2023, Defendant Sparks knew that he might be under criminal investigation for conduct relating to the extortion scheme.

154.    Other than Williams and JCPD officers, Female 4 was one of the only individuals who could inculpate Defendant Sparks in the scheme.

---

[2] Female 4 is one of Sean Williams' accomplices, GCC business partner, and one who withdrew cash from the GCC accounts to bribe JCPD officers.

155. On December 7, 2023, counsel for the Defendants' in the Doe case received the draft Second Amended Complaint in the Doe case with the allegations regarding Female 4 facilitating payments to JCPD officers, including Defendant Sparks, on behalf of Williams.

156. By then, Plaintiff in the Doe case H.A. was communicating with Female 4. Female 4 and H.A. had been friends' years earlier and had reconnected via Facebook in or around early December 2023.

157. During their conversations over the next month, H.A. attempted to gain Female 4's trust and to encourage her to speak candidly about her involvement in JCPD corruption. H.A. also encouraged Female 4 to obtain counsel, stressing that Female 4 should protect her own interests.

158. On December 20, 2023, and January 3, 2024, two deposits from unknown sources of $12,098.10 each, cleared Defendant Sparks' checking account with Truist Bank.

159. On January 11, 2024, counsel for the Doe Plaintiff's spoke by phone with Female 4 to discuss, among other things, Female 4 telling the truth about what happened, the possibility that Female 4 was a class member, and Female 4 obtaining counsel.

160. That same day, a check was written for $20,000 from Defendant Sparks' Truist checking account. The check purported to be to an individual affiliated with a construction company that had done work on Defendant Sparks' deck in October-November 2023.

161. The next day, on January 12, 2024, $20,000 was transferred from Defendant Sparks' Truist savings account to his checking account.

162. Also on January 12, 2024, Female 4 received a phone call from a consignment shop in Nashville where she had consigned a piece of jewelry (a Cartier gold necklace).

163. On January 17, 2024, the $20,000 check from Defendant Sparks' Truist checking account was deposited or cashed at what appears to be another Truist Bank branch.

164. Records obtained through discovery in the Doe case show that the following day, on January 18, 2024, the consignment shop in Nashville deposited $21,000 in cash into its bank account.

165. According to the shop's records, an unknown buyer purchased Female 4's necklace through an intermediary jewelry store at a tradeshow in Miami, Florida. No records, receipts, or invoices for the transaction exist.

166. Four days later, on January 22, 2024, the consignment shop wired $14,000 to Female 4's bank account.

167. On January 24, another check for $1,200 from Defendant Sparks' Truist checking account was cashed or deposited.

168. Thus, Defendant Sparks' bank records show a total of $21,200 in outgoing checks within seven days of when the consignment shop deposited $21,000 in cash from a purported buyer— about whom no records exist—and then wired $14,000 to Female 4.

169. The totality of the above evidence supports that Defendant Sparks directed this payment to Female 4 at a time when he knew she was a witness in the ongoing public corruption investigation, in which he was a potential target, and after Female 4 had become aware that she might benefit from the Doe Plaintiffs' class action lawsuit against Defendant City.

I.    **Defendants' Refusal to Investigate Williams.**

170. On September 19, 2020, at 7:46 p.m., CID supervisor Hilton sent an email to JCPD leadership, including Defendants then-Chief Turner and then-Captain Peters, setting forth the details of Plaintiff's case and the investigative steps taken by JCPD that day. Hilton explained that JCPD would need to obtain additional search warrants for the digital devices and safe seized from Williams' apartment.

27

171. Against Hilton's directive, the most senior leaders in charge of this investigation, namely, Defendants then-Chief Turner and then-Captain Peters, who headed CID, made the decision not to obtain a search warrant in response to Hilton's email in September 2020.

172. Over the next four months, Defendant Turner actively discouraged Dahl from obtaining a search warrant for these devices and Defendant Peters would receive updates about the status of these devices from Defendant Sparks (presumably, that they remained in JCPD custody, unsearched).

173. This demonstrates that both Defendants Turner and Peters knew about and were in positions to control whether JCPD submitted a completed search warrant for these devices.

174. Ultimately, Defendant Sparks delayed sending an affidavit to Dahl until January 2021 and never sent her a version that was adequate to submit to a magistrate judge.

175. Defendants' refusal to search relevant evidence in their custody further demonstrates their role in Williams' conspiracy.

176. In April-May 2022, JCPD disregarded a second chance to stop Williams. Then a fugitive on the felon-in-possession of ammunition charge, Williams could not participate in normal commercial transactions. However, with the feds on his heels he needed to liquidate as many of his assets as possible.

177. His fifth story penthouse apartment, the very scene of his crimes was top of his list to sell.

178. Luckily for Williams, former Johnson City Manager Cathy Ball was interested and willing to participate in an off-market purchase of Williams' penthouse apartment and allow Williams to close the deal either remotely or through a power-of-attorney.

179. Ball had Turner use JCPD systems to research the area around Williams' apartment—the same apartment where Williams had raped dozens of women and assaulted Mikayla.

28

180.   Despite knowing that Williams was a fugitive and the funds from the sale would likely aid Williams in remaining a fugitive, Ball was willing to go through with the deal, but Williams pulled out of the deal.

181.   Ball disclosed her role in this attempted real estate purchase only after evidence was publicly known.

182.   Ball still has not publicly acknowledged that she intended to close the deal while knowing that Williams was a fugitive even though text messages show she knew the seller she was attempting to buy from was a federal fugitive and an accused serial rapist.

**J.   Defendants' Hide Cash Received from Williams and his Co-Conspirators.**

183.   Between 2018 and 2022, Defendant Jenkins engaged in a money laundering scheme to launder the ill-gotten cash he received from Williams and Female 4 by paying off a series of auto, construction, and home loans totaling over $400,000. This amount is representative of the funds he received from his participation in the conspiracy with Williams.

184.   The Does issued a subpoena for certain bank records of Defendant Jenkins'. These records show Defendant Jenkins repaid approximately $391,132.67 worth of loans between January 2020 and August 2022 and engaged in a pattern of auto loan repayments indicative of money laundering.

185.   Within days of the search of Williams' apartment on September 19, 2020, for instance, Jenkins paid off one loan worth $34,308.89 and opened a new loan for $45,236.22. Defendant Jenkins used these loan payments to launder cash obtained from the safe.

186.   On June 1, 2022, Female 4 withdrew $11,800 in cash from a GCC account which she controlled. At the time, Female 4 was in regular communication with JCPD officers, and JCPD was providing her with protection.

29

187. The next day, Defendant Jenkins opened a new car loan for $11,000 with a total amount financed of $11,855.79. Defendant Jenkins opened this car loan to launder the cash from Female 4 as part of the conspiracy.

188. This was one of nine auto loans Defendant Jenkins took out within four years, purportedly for a 2006 Toyota Tundra despite having just paid off a loan for a 2018 Toyota Tundra in January 2022. Defendant Jenkins paid off the new loan for $11,000 within two months.

189. By June 2022, Defendant Jenkins knew or should have known that the financial benefits he received from Williams' company GCC through Female 4 were in furtherance of Williams' conspiracy.

190. Defendant Jenkins also deposited smaller sums of cash during this time in amounts that reflected the cash payments he received from Williams through Female 4.

191. Defendant Sparks also used elaborate means to conceal the illicit funds he received from Williams, moving money through multiple savings, checking, and loan accounts which he held or controlled with at least four different financial institutions. He did this to disguise the deposit, transfer, and withdrawal of funds which surpassed his legitimate sources of income.

192. Defendant Sparks also deposited smaller sums of cash directly into his checking account, with unexplained deposits totaling approximately $68,000 during the alleged conspiracy in one of his accounts. These amounts reflected the cash payments he received from Williams through Female 4.

## K. Defendants Take Affirmative Acts to Prevent Female Victims from Reporting Williams' Crimes.

193. Defendants intentionally silenced Williams' assault victims to prevent investigation and arrest of Williams, and because of a discriminatory prejudice against female victims.

194. Defendant Peters ridiculed and made jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD.

195. On another occasion, Defendant Peters made jokes about Williams' victims' clothing and appearances.

196. Defendants Turner and Peters dismissed Williams' victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams drugged and raped them.

197. Defendants Turner and Peters dismissed Williams' victims because they had financial incentives in the form of illegal bribes to prevent Williams from facing any criminal charges and because of a discriminatory prejudice against female victims.

198. Williams continued trafficking guns and drugs, drugging and raping women, and sexually exploiting children for years because Defendants failed to investigate, arrest, or charge Williams.

199. As a result of Defendants' acceptance of bribes and turning a blind eye, Plaintiff was drugged by Williams and pushed by him out a five-story window, sustaining life-threatening injuries on September 19, 2020.

200. In December 2022, Defendants obtained information that one of Williams' victims as identified as Female 9 in the Doe case was meeting with civil rights attorneys at her public housing unit in Johnson City.

201. The next day, on December 8, 2022, Female 9 met with an FBI Special Agent to provide a statement about her sexual assault at the hands of Williams as a witness in the FBI's sex trafficking investigation into Williams.

202. Either late at night on April 18 or early in the morning on April 19, 2023, Female 9 was standing outside Tipton's Street Pub in downtown Johnson City with a male companion, waiting

31

for her ride in an otherwise empty parking lot, when at least two JCPD patrol cars drove up and stopped.

203. JCPD officers approached the male to handcuff him. Williams' victim pulled out her cell phone to start videoing as there appeared to be no legitimate law enforcement purpose for this encounter.

204. One of the officers took hold of her arm. When she pulled her arm back, the officer proceeded to physically assault her. Her head hit the ground so hard that she urinated herself.

205. While she was on the ground, several officers pinned her down while other officers continued to assault her. The next day, she had bruises all over her body.

206. The JCPD police report documenting the incident stated that a security guard for Tipton's reported that the male had refused to leave Tipton's and that the male and Female 9 were arguing in the parking lot. In fact, by the time JCPD officers arrived, neither Female 9 nor the male were inside Tipton's, nor were they arguing.

207. The police report provides no additional facts (i.e., any evidence of physical violence) that would justify the officers' immediate arrest of the two. In other words, even based on the version of the facts contained in the police report, it appears that the officers' arrest of Female 9 and her companion lacked probable cause and constituted an unlawful arrest.

208. According to the police report, JCPD officers justified their arrest of Female 9 based on her "disorderly conduct and resisting arrest." Once the officers had arrested Female 9, they conducted a search incident to arrest of her backpack. The report claims that a small baggy containing a white substance, which a preliminary field test showed to be cocaine, was found in the backpack. In fact, Female 9 did not possess any narcotic substance in her backpack and JCPD officers planted the evidence.

32

209. Later that same day, on April 19, 2023, Female 9 received an eviction letter from the Johnson City Housing Authority stating that the Department of Community Safety had "completed an investigation" into her arrest and would be terminating her lease. She was given four days to vacate the premises. She also received notice that if she was seen on the property after the four days, she would be arrested for trespassing.

210. Female 9 fought the eviction unsuccessfully. She has been without permanent housing since in or around July 2023. As a result of her eviction, she was unable to maintain custody of her minor children.

211. Defendant Legault was the supervisory patrol officer who signed off on the police report documenting Female 9's arrest. The unlawful arrest, physical assault, and subsequent eviction of Female 9 was part of an effort by JCPD officers, including Defendant Legault, to retaliate against and intimidate Female 9, who was a witness in an ongoing federal sex trafficking investigation. Defendant Legault approved the unlawful detention of Female 9 and her male companion to discourage any effort to uncover the conspiracy between Defendants and Williams.

212. On or about June 23, 2022, Special Assistant United States Attorney Kateri Lynne Dahl, initiated a civil action against Defendants for her unlawful firing. Dahl's termination was a result of her insistence on investigating Williams, an investigation that Defendants had a vested interest in preventing as it likely would uncover their unlawful actions in protecting Williams.

213. Defendants facilitated and supported Williams' continued criminal conduct by assisting Williams in perpetrating and concealing his crimes and obstructing the investigation and prosecution of Williams despite overwhelming evidence.

214. Defendants engaged in witness intimidation to facilitate and support Williams' criminal conduct both because they financially benefited from Williams' bribes and of their discrimination against women.

**L.     Defendant City's Response to the Dahl Complaint.**

215. In August 2022, responding to community protest following the Dahl Complaint, Defendant City initiated an independent third-party review of JCPD's handling of sexual assault investigations. Defendant City hired the Daigle Law Group (DLG) to review JCPD's processes and procedures specific to sexual assault investigations during the period of January 2018 through December 2022—the same period within which Plaintiff was allegedly assaulted and pushed out of Williams' apartment window and during which JCPD knowingly failed to investigate Williams' crimes.

216. Rather than exonerating JCDP, however, the resulting report was damning. Released by the City on July 18, 2023, four weeks after the filing of the initial complaint in the Doe case, the report from the City's own expert found that JCPD's overall handling of women's reports of sexual assault and rape was severely deficient and rife with discriminatory conduct based on hostility and bias towards women.

217. According to the report, this unlawful and unconstitutional conduct discouraged victims from pursuing their cases. JCPD supervisors further permitted investigators to close sexual assault cases improperly, based on the purported reluctance of the victims, even when prosecution would have otherwise been possible.

218. Nearly a year later, on July 18, 2023, Defendant City released DLG's findings, which were summarized by DLG in a 45-page report.

34

219. According to the report, DLG considered JCPD's practices and procedures to determine whether the agency's "pattern and practice" or "custom" with respect to sexual assault investigations met Constitutional standards of policing. It found they did not.

220. To reach this conclusion, DLG reviewed case files for more than 325 reports of sexual assault made to the JCPD between January 2018 and December 2022. DLG also conducted an onsite inspection in December 2022, and interviewed Defendants Turner and Peters, as well as six JCPD officers, left unidentified in the report.

221. DLG found that JCPD's practices discouraged female victims of sexual assault from working with law enforcement to pursue charges, thereby damaging the investigative process and compromising JCPD's ability to conduct thorough and impartial investigations into the victims' reports of sexual assault.

222. The DLG investigation revealed that no legitimate law enforcement purpose—or any other reason—justified these inadequacies. Instead, the JCPD's practice of discouraging women from pursuing sexual assault charges stemmed from misconceptions and stereotypes about women and victims of sexual assault—in other words, sex-based bias.

223. DLG further found that JCPD policies and procedures were insufficient to meet industry standards and legal requirements to investigate sexual assault investigations. JCPD had failed to train officers to ensure effective and unbiased responses to allegations of sexual assault and had inadequate supervision and internal oversight of officers.

224. DLG specifically noted JCPD's deficiency in responding to non-stranger and alcohol or drug-facilitated sexual assault—relevant here as Plaintiff accused Williams of drugging and at the very least attempting to assault her.

225. DLG concluded:

35

> JCPD's investigative practices were found to compromise the effectiveness of their response to sexual assault and lead to under-enforcement of sexual assault laws in Tennessee. At times, JCPD failed to employ key investigative practices that, if properly implemented, would safeguard potential evidence, protect the rights of victims and suspects, and facilitate a thorough investigation. For instance, our review found that JCPD too often fails to collect evidence and does not take proper steps to obtain timely, credible statements from suspects and witnesses. Our review revealed instances where JCPD officers likely would have obtained statements and facts to support a prosecution if they had used the investigative tactics known to be effective and essential in sexual assault investigations, especially investigations of non-stranger sexual assault. These investigative deficiencies compromise the investigative process and unnecessarily place victims at an increased risk of harm.

226. DLG also found that JCPD's investigations into sexual assault reports were inconsistent, ineffective, and incomplete, finding JCPD often failed to collect evidence or failed to document the collection of evidence. JCPD, according to the report, also failed to interview suspects and witnesses during sexual assault investigations. Where witnesses were interviewed, officers failed to document their statements, even though the investigative files indicated that such statements had been taken.

227. From 2018 to 2022, of the 133 cases where rapes had been reported to JCPD, 105 cases had an identified suspect, but only 36 of these suspects (or 34% of the known suspects) were ever interviewed.

228. In the rare cases where JCPD officers did interview suspects, their practice was to call to schedule the interview, sometimes weeks in advance, providing the suspects the opportunity to modify or coordinate their stories. DLG found this practice "baffling," as it "undermine[d] the integrity of sexual assault investigations."

229. DLG found that JCPD practices actively discouraged sexual assault victims from pursuing charges and participating in investigations.

230.    In one example provided in the report, a JCPD investigator insisted that a sexual assault victim come to JCPD headquarters to provide a written statement of her assault.

231.    When she came in and provided a 15-page written statement describing her assault, the investigator required her to re-write the statement on a JCPD form and then called her back into the office one month later to question her about purported inconsistencies between the two statements.

232.    After questioning the victim on "numerous suspicious and inconsistent statements," the victim changed her mind and said she no longer wished to pursue the case. There was no suspect interview and no mention of sexual assault kit results.

233.    The report also identified JCPD practices which made reporting sexual assaults "unnecessarily burdensome" to the victims, including practices motivated by gender bias and discriminatory animus against women. These practices include a reluctance of the officers/investigators to continue investigative steps unless the victim comes to the Department to give a statement.

234.    A requirement that victims and witnesses be interviewed at the police station, rather than at the location most convenient and comfortable for the victim. Using interview rooms at the JCPD that are suspect oriented with visible restraining devices.

235.    Additionally, JCPD investigators asked victims whether they wished to seek criminal prosecution early in the investigation and whether they would testify against the accused. Statements by JCPD investigators focus on the emotional toll of prosecution and the victim's unwillingness to participate in the prosecution.

236.    JCPD's sexual assault investigations are sometimes compromised by an investigator's unwarranted gender-based assumptions and stereotypes about women.

237. JCPD generally does not invite advocates to be present during victim interviews.

238. Instead, two JCPD detectives typically interview a victim without advocate participation. This practice is more appropriate for an interrogation of a suspect than an interview of a crime victim and sometimes prevents detectives from developing the necessary rapport with women victimized by sexual assault.

239. Reporting a sexual assault, including the time spent at hospitals and with JCPD, can take many hours.

240. JCPD too often does not follow up with victims to document evolving injuries, such as bruises.

241. DLG further found that JCPD failed to secure crime scenes in responding to reports of sexual assault. Specifically, the report concluded, "JCPD's securing of crime scenes and using search warrants to document evidence were found to be insufficient."

242. JCPD's systemic failures of improperly documenting sexual assault investigations not only violated their own internal orders, but also standard police practice which are intended to protect and serve their community.

243. DLG found that JCPD's interactions with women reporting sexual assault "reflect reliance on gender-based stereotypes and bias, and that this discrimination is responsible in part for the deficiencies in JCPD's response to sexual assault."

244. This conduct included "overtly discriminatory statements from JCPD officers, investigators, or leadership."

245. JCPD investigators also improperly relied on a woman's sexual history in evaluating the veracity of the sexual assault report.

246. DLG found that JCPD supervisors were allowing sexual assault cases to be closed even when prosecution was still possible. The report concluded that the "JCPD process of closing assault and sexual assault investigations is flawed and inaccurate."

247. The report found that JCPD investigators were improperly using the "exceptional circumstances" justification in their reporting system to justify closing sexual assault cases, often where the requirements for closure under this basis were not met.

248. For instance, the report cited closure of rape cases: Of 133 rape cases reported during 2018 – 2022, 66 (nearly 50%) were closed based on "exceptional circumstances." Of these 66 "exceptional circumstances" cases, 25% were based on JCPD's claim that the victim was reluctant to participate, 31% were based on of the reporting officer's claim that the victim was uncooperative (based on non-returned phone calls or messages, and/or the inability of the officer to contact the victim), and 40% were based on the prosecutor's office declining to prosecute. However, of those declinations, the reason usually provided was that the victim was declining to participate in the prosecution. But closure based on a victim's cooperation or reluctance to participate in the prosecution is not a proper basis for closure under JCPD's own internal reporting requirements.

249. Thus, according to the DLG report, JCPD officers engaged in discriminatory and biased conduct to discourage women from pursuing cases of sexual assault and rape, and then used the resulting reluctance on the part of victims to close rape cases improperly and in violation of department rules and requirements.

250. As a result, between 2018 – 2022, only 11.27% of reported rape cases ended in arrest of the suspect. It is not clear from the DLG report how many—or if any—of these arrests resulted in convictions.

39

**M.     JCPD Engaged in Discriminatory Conduct.**

251.    JCPD's failure to protect victims of Williams' female assault victims, including Plaintiff, was consistent with an institutional practice and ongoing policy of JCPD, and was motived, in part, by the officers' discriminatory animus towards women.

252.    As outlined in the DLG report, JCPD investigators routinely take steps that discourage victims of sexual assault from pursuing charges based on "an investigator's unwarranted gender-based assumptions and stereotypes about women," thereby compromising the investigations.

253.    As alleged above, JCPD officers, and in particular, Defendant Sparks deployed these practices here in attempting to discourage and dissuade Williams' victims from reporting Williams' crimes.

254.    As set forth in the Dahl Complaint, JCPD officers made statements to her that evidenced their discriminatory animus towards women victims of sexual assault, including, among other statements, the following:

- Chief Turner cast doubt on the credibility of Williams' victims even after their names appeared on the "Raped" list, dismissing their cases as potentially "consensual sex."

- On another occasion, JCPD Captain Peters made jokes about Williams' victims' clothing and appearances.

- One JCPD investigator, Defendant Toma Sparks stated in response to the rape complaints against Williams, "In my 20 years on the force, I've only encountered one real rape."

- JCPD officers made statements questioning the credibility of victims and made harassing comments to Dahl.

- One male investigator stated to Dahl: "Well Kat, if you're so invested in developing this case, go have a drink at Label and let [Williams] pick you up and take you back to his place. We'll come get you in an hour."

**N.    Plaintiff Could Not Have Learned of JCPD's Intentional Failure to Investigate Williams Following Her Fall Until the First Amended Class Complaint was filed on September 6, 2023.**

255.    Plaintiff learned of Defendants' intentional mishandling of her investigation no earlier than the filing of the first amended Class Complaint on September 6, 2023.

256.    Although, before this date, Plaintiff was aware that the JCPD failed to bring charges against Williams related to the incident and that JCPD even indicated as early as September 21, 2020 (two days after the incident), that they did NOT suspect foul play Plaintiff believed JCPD was investigating the incident. She had no knowledge that JCPD intentionally failed to investigate Williams to protect both Williams in exchange for bribes and themselves from being discovered for accepting these bribes.

257.    Plaintiff was not aware that Williams was "untouchable" because he had bought off the JCPD. In fact, Plaintiff trusted JCPD specifically Defendant Sparks to investigate her fall. She continued to cooperate and speak to Sparks about the investigation until Sparks stopped returning her phone calls over a year after the incident.

258.    Plaintiff, though not satisfied with the handling of her case believed Defendant Sparks and others would continue to investigate and take appropriate action to discover the reason for Plaintiff's fall. Plaintiff had continued communication with JCPD, specifically with Defendant Detective Sparks and he ensured Plaintiff that an investigation was ongoing.

259.    The Class Complaint revealed JCPD officers arrived at Williams' apartment shortly after the incident occurred that night.  According to the Government's response to Williams' motion to suppress in the pending felon in possession of ammunition case, *see United States v. Williams*, 2:21-cr-00027-DCLC-CRW, Doc. No. 38 ("Government's response"), Det. Sparks arrived sometime thereafter with another JCPD officer, Defendant Justin Jenkins. The two officers shouted

41

up to Williams' apartment from the street, asking to be let in, and eventually obtained the passcode to enter the apartment from someone on the scene.

260. Inside the apartment, Williams showed Defendants Det. Sparks and Officer Jenkins' video clips taken from cameras positioned around his apartment, including a camera facing the entrance door to the apartment and a camera facing the elevators.

261. Williams used his cell phone to show these videos to the officers and even offered to text the videos to Defendant Officer Jenkins.

262. Williams claimed that the video cameras inside his apartment which pointed towards the window out of which Plaintiff fell were not recording on September 19, 2020.

263. While at Williams' apartment on September 19, 2020, Defendants took Williams' safe, which kept $500,000.

264. When the safe was returned to Williams, only $81,000 was left per the Class Action Complaint, ¶ 86.

265. Defendants likely took the money as payment for not investigating Williams for his actions on September 19, 2020.

266. Shortly thereafter, Williams told the officers to leave the apartment.

267. Rather than secure Williams' apartment or any of the digital media which may have contained evidence while they sought a search warrant for the attempted homicide investigation, JCPD officers left.

268. After the officers left, Williams and/or Diaz-Vargas moved and hid firearms and illicit drugs located throughout the apartment. Williams and/or Diaz-Vargas placed the items in a duffle bag and moved them to the roof.

269. According to the Government's response, later that morning at approximately 4:17 a.m., Defendants Det. Sparks and Officer Jenkins interviewed Williams at JCPD headquarters.

270. Sometime before this interview (the exact time is not stated in the Government's response), Defendant Det. Sparks offered to drive Williams to JCPD headquarters from Williams' apartment downtown. Williams agreed. Defendant Det Sparks then gave Williams a ride in his car. Williams was not handcuffed, and he rode in the front passenger seat next to Defendant Det. Sparks. There is no record in the Government's response, nor in the affidavits of Defendant Det. Sparks, of what the two spoke about during this ride.

271. Williams' interview at JCPD headquarters was video recorded.

272. At approximately 4:17 a.m., Williams was placed in an interview room. The door was left open, and Williams was not handcuffed.

273. Even though Williams had just shown Defendant Det. Sparks digital evidence of the crime under investigation on his cell phone—demonstrating to Defendant Det. Sparks that Williams could access, and therefore likely manipulate, the camera footage from his phone—the officers permitted Williams to retain possession of his cell phone for the next 30 minutes while he sat in the interview room.

274. From 4:17 a.m. to 4:20 a.m. Williams was alone in the interview room with his cell phone while Defendant Officer Jenkins got paperwork together.

275. Once the interview began, at approximately 4:20 a.m., Defendant Officer Jenkins closed the door. Defendant Officer Jenkins and Williams began to speak about whether the surveillance cameras captured video of Plaintiff falling. Williams continued to maintain possession of his cell phone throughout this conversation.

276. Williams then told Defendant Officer Jenkins that he could text Jenkins the videos he had previously shown them (Defendants Officer Jenkins and Det. Sparks). Defendant Officer Jenkins asked Williams to email the videos instead.

277. Williams stated he believed he could email the videos and proceeded to look at his cell phone.

278. According to the Government's response, Williams "became distracted" while looking at his cell phone.

279. He then told Defendant Officer Jenkins that he could not find any videos of Plaintiff falling.

280. Based on the timeline provided in the Government's response, it appears that Williams spent the next several minutes manipulating data on his cell phone while Officer Jenkins watched and took no action. Jenkins knew that Williams had evidence on his cell phone and was taking steps to dispose of this evidence.

281. Approximately eight minutes into their conversation, Defendant Officer Jenkins asked Williams for a statement about the incident. Defendant Officer Jenkins then read Williams *Miranda* warnings.

282. Williams remarked that he thought it was strange that he was being read his rights. Defendant Officer Jenkins told Williams that he (Williams) was not under arrest and Defendant Officer Jenkins was simply reading *Miranda* warnings because he (Defendant Jenkins) was going to ask questions.

283. Williams asked for a lawyer to be present but then stated that he would give a statement but would not answer questions.

44

284.     Defendant Officer Jenkins and Williams began to discuss what Williams meant by wanting a lawyer but still agreeing to answer some questions, but not all.

285.     Defendant Officer Jenkins told Williams that they needed to come to an agreement before they could proceed with an interview.

286.     Defendant Officer Jenkins provided Williams with the written *Miranda* waiver for review, but Willims did not agree to sign it and instead asked for his lawyer.

287.     At approximately 4:35 a.m., Defendant Officer Jenkins left the room, continuing to allow Willims to maintain custody of his cell phone.

288.     For the next six minutes, Williams spoke to several people on the phone while purportedly attempting to call his lawyer.

289.     According to the Government's response, at some point Williams stated to someone over the phone that since he could not contact his lawyer he would just leave and come back to speak to the investigators later.

290.     At approximately 4:41 a.m., Williams knocked on the door of the interview room. Defendant Det. Sparks opened the door. Williams told Defendant Det. Sparks that he needed a charger for his phone so that he could call his attorney. Williams then asked what they would do if he could not contact his lawyer. Williams and Defendant Det. Sparks then discussed whether Williams wanted to speak to them without a lawyer.

291.     At this point, over 30 minutes into Williams' interview and approximately two hours after Williams' first encounter with JCPD police on September 19, 2020, Defendant Det. Sparks seized Williams' cell phone. Det. Sparks then told Williams that he was getting a search warrant for its contents.

45

292. According to the Government's response, Defendant Det. Sparks and Williams then argued over whether Defendant Det. Sparks could seize Williams' cell phone.

293. Williams asked whether Defendant Det. Sparks would give him a ride home, and Defendant Det. Sparks agreed to drive him home.

294. At approximately 4:46 a.m., Defendant Det. Sparks told Williams he would be right back. At Approximately 4:51 a.m., Williams opened the door of the interview room and asked to leave. Williams asked for his cell phone but was told it had been seized pending a search warrant.

295. At some point thereafter—the Government's response does not state the time—Williams left JCPD headquarters and walked back to his apartment.

296. At 8:52 a.m. on September 19, 2020, Defendant Det. Sparks applied for a warrant for Williams' apartment to search for evidence of Tennessee Code Annotated § 39-11-106, attempted criminal homicide.

297. According to Defendant Det. Sparks' September 19, 2020, affidavit in support of this warrant, JCPD officers "powered off" Williams' cell phone at some point that morning and then powered the phone back on "after Williams left" with the intent to place the phone in airplane mode. The affidavit goes on to state: "When the phone was powered on, it had a message displaying that it was lost, which would suggest that Sean Williams has access to other devices in the residence that could be connected to the camera system."

298. In his affidavit, Defendant Det. Sparks then sought permission to seize: "video surveillance cameras; video surveillance storage devices; any electronic device capable of connecting to the camera system, including but not limited to: cell phones, computers, tablets, and personal digital assistants; any trace evidence that would suggest an assault or struggle occurred."

46

299. In the September 19, 2020, affidavit, Defendant Det. Sparks failed to include any information about the 45-minute interview that he and Defendant Officer Jenkins had conducted of Williams at JCPD headquarters that morning. Nor did Defendant Det. Sparks explain that he had permitted Williams to retain custody of his cell phone during the entirety of this interview.

300. When JCPD officers returned with a search warrant at approximately 10 a.m. on September 19, 2020, they seized a number of digital devices from Williams' apartment, including four phones, four computers, and three memory cards.

301. According to the Government's response, JCPD officers seized, among other items, video cameras that had been hidden in a closet under paper towels. The video surveillance cameras which officers had observed hours before in the apartment had all been taken down while JCPD had left the apartment unsecured.

302. The digital devices seized on September 19, 2020, remained in the custody of JCPD for over two years without being properly searched for evidence.

303. Had JCPD officers properly secured, seized, and searched the digital evidence in Williams' apartment that night, they would have found evidence that Williams drugged Plaintiff and caused her fall.

304. To date, no charges have been filed against Williams as a result of the attempted homicide investigation.

305. For years, Sean Williams was allowed to terrorize the citizens of Johnson City victimizing not only adult citizens but children and even infants.

306. William's crimes went uninvestigated and unpunished in exchange for bribes.

307. On November 14, 2024, after 37 minutes of deliberation, a jury found Williams guilty on three counts of child porn production.

47

308. During this trial, the prosecution showed photo evidence that had been in the possession of JCPD for years. Evidence that could have put Williams in prison and saved countless victims.

309. Williams will be held accountable for his crimes. The Defendants in this case must be held accountable for their complicity as well.

## CAUSES OF ACTION

### COUNT I
### Tennessee Governmental Tort Liability Act, T.C.A. § 29-20-205 Against all Defendants.

310. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

311. The conduct of the Individual Defendants as alleged above constitutes negligence for which no exception exists under T.C.A. § 29-20-205.

312. Defendant City is liable for the injuries proximately caused by the negligent acts or omissions of Defendants Chief Turner, Captain Peters, Investigator Higgins, Investigator Legault, Investigator Jenkins and Investigator Sparks in failing to investigate Williams prior to the incident involving Plaintiff. Johnson City is liable for the police officers' acts of destroying the evidence against Williams and the omission of failing to preserve the evidence and failing to investigate Williams both before and after the incident involving Plaintiff.

313. Defendant then-Captain Peters had a duty to conduct an investigation consistent with the internal policies of JCPD. Instead, even after being directed to do so by Hilton, Defendant Peters failed to investigate, exercise search warrants, or interview witnesses relevant to Plaintiffs fall and the moments preceding it. Because Defendant Peters, in concert with his coconspirators, failed to investigate Plaintiffs fall, Plaintiff was unable to obtain evidence that would have provided for a cause of action against Williams for her personal injury resulting from Williams' assault. Plaintiff

48

is now responsible for over $3,000,000 in medical bills which Williams would otherwise be liable for.

314. As required by JCPD internal policies, Defendant Legault had a duty to investigate complaints made by female victims of Williams claiming they were assaulted or sexually assaulted by Williams. Instead of investigate the Williams' victim's claims, Defendant Legault failed to interview witnesses, send victim information to Assistant US Attorney, Dahl, and failed to execute search warrants despite being directed to do so. Because Defendant Legault conduct falls short of the expectation created for JCPD's investigators by JCPD's own policies, Plaintiff was unable to obtain evidence that would have provided for a cause of action against Williams for her personal injury resulting from Williams' assault. Plaintiff is now responsible for over $3,000,000 in medical bills which Williams would otherwise be liable for.

315. As required by JCPD internal policies, Defendant Turner had a duty to investigate complaints made by female victims of Williams claiming they were assaulted or sexually assaulted by Williams. Instead of investigate the Williams' victim's claims, Defendant Turner failed to interview witnesses, send victim information to Assistant US Attorney, Dahl, and failed to execute search warrants despite being directed to do so. Because Defendant Turner conduct falls short of the expectation created for JCPD's investigators by JCPD's own policies, Plaintiff was unable to obtain evidence that would have provided for a cause of action against Williams for her personal injury resulting from Williams' assault. Plaintiff is now responsible for over $3,000,000 in medical bills which Williams would otherwise be liable for.

316. As required by JCPD internal policies, Defendant Sparks had a duty to investigate complaints made by female victims of Williams claiming they were assaulted or sexually assaulted by Williams. Instead of investigating the Williams' victim's claims, Defendant Sparks failed to

49

interview witnesses, send victim information to Assistant US Attorney, Dahl, and failed to execute search warrants despite being directed to do so. Because Defendant Sparks conduct falls short of the expectation created for JCPD's investigators by JCPD's own policies, Plaintiff was unable to obtain evidence that would have provided for a cause of action against Williams for her personal injury resulting from Williams' assault. Plaintiff is now responsible for over $3,000,000 in medical bills which Williams would otherwise be liable for.

317. As required by JCPD internal policies, Defendant Jenkins had a duty to investigate complaints made by female victims of Williams claiming they were assaulted or sexually assaulted by Williams. Instead of investigate the Williams' victim's claims, Defendant Jenkins failed to interview witnesses, send victim information to Assistant US Attorney, Dahl, and failed to execute search warrants despite being directed to do so. Because Defendant Jenkins conduct falls short of the expectation created for JCPD's investigators by JCPD's own policies, Plaintiff was unable to obtain evidence that would have provided for a cause of action against Williams for her personal injury resulting from Williams' assault. Plaintiff is now responsible for over $3,000,000 in medical bills which Williams would otherwise be liable for.

318. As required by JCPD internal policies, Defendant Higgins had a duty to investigate complaints made by female victims of Williams claiming they were assaulted or sexually assaulted by Williams. Instead of investigating the Williams' victim's claims, Defendant Higgins failed to interview witnesses, send victim information to Assistant US Attorney, Dahl, and failed to execute search warrants despite being directed to do so. Because Defendant Higgins conduct falls short of the expectation created for JCPD's investigators by JCPD's own policies, Plaintiff was unable to obtain evidence that would have provided for a cause of action against Williams for her personal

50

injury resulting from Williams' assault. Plaintiff is now responsible for over $3,000,000 in medical bills which Williams would otherwise be liable for.

**COUNT II**
**Civil Conspiracy Against all Defendants.**

319. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

320. As alleged in detail above, Defendants intentionally conspired together, conspired with Williams, and conspired with Williams' other co-conspirators by agreement and understanding to further Williams' acts, destroy evidence against Williams, and obstruct the investigation into Williams for years, including Williams' acts against Plaintiff on September 19, 2020.

321. Williams engaged the assistance of Defendant-conspirators (used interchangeably with "Defendants") Turner, Sparks, Jenkins, Legault, Peters, Higgins, and Johnson City acted in concert with one another to destroy evidence, concealed information from other agencies, perpetuated known a criminal's ongoing violent and heinous criminal acts, and concealed evidence from victims of sexual assault in exchange for bribes from Williams.

322. The Defendant-conspirators engaged in acts that were discriminatory to a class of citizen, females, that were victims of assault and sexual assault.

323. Defendant-conspirators violated the rights of a class of citizen by engaging overt criminal acts to protect Williams while he raped women and children, assaulted Plaintiff leading to her near-death injuries, sold narcotics, drugged women, and engaged in the trade of child pornography.

324. Under color of law, Defendant-conspirators deprived Plaintiff and other victims of assault and sexual assault of their Constitutional rights including Plaintiff's right to equal protection and rights arising therefrom.

51

325. Defendant-coconspirators worked in concert and continue to work in concert to conceal information that could stop ongoing rape, creation and distribution of child pornography, and related to Plaintiff's fall and cause of action against Williams. Had the women coming forward with complaints of rape been directed to the police or other public servants that were not engaged in a criminal conspiracy with the perpetrated of the crimes, the perpetrator of the crimes would not have had an opportunity to assault Plaintiff. Defendant-coconspirators engaged in a conspiracy built upon criminal activity that enabled Williams to assault Plaintiff.

326. Evidence of Defendant Higgins involvement in the conspiracy includes his acceptance of bribes from Williams and his associates, his refusal to investigate Williams despite receiving instruction to do so and acting as a conduit of communication between conspirators.

327. Evidence of Defendant Legault's participation in the conspiracy includes his involvement in the harassment, arrest, and unorthodox eviction of Jane Doe 9 in retaliation for her efforts to report her rape to the FBI and hiring a Civil Rights Attorney to advocate on her behalf. Legault withheld information relevant to investigation of Williams and/or his victims from the Washington County District Attorney and AUSA Dahl; instead, he provide piecemeal reports and information intending obscure the truth from interested parties, allow Williams to continue his criminal activity. Legault ignored Dahl's repeated pleases to arrest Williams despite knowing he was a danger to the public and had an active warrant for his arrest. Not only did Legault fail to arrest, but he lied about Dahl's performance to justify her firing in retaliation for investigation Williams. Additionally, Defendant Legault took bribes from Williams and his associates in exchange for his efforts to protect Williams.

52

**COUNT III**
**Fraudulent Concealment Against Defendants**

328.    Plaintiff restates and incorporates herein the allegations in the above paragraphs.

329.     Defendants took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so.

330.    Plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence.

331.    Defendants had knowledge of the facts giving rise to the cause of action; and concealed material facts from Plaintiff by withholding information or making use of some device to mislead plaintiffs, or by failing to disclose information when he or she had a duty to do so.

**COUNT IV**
**Equal Protection, 42 U.S.C. § 1983**
**Unconstitutional Pattern and Practice as to Women Reporters.**

332.    Plaintiff restates and incorporates herein the allegations in the above paragraphs.

333.    Defendants failed to investigate Plaintiff's incident and failed to investigate Williams.

334.    Defendants failed to preserve evidence collected against Williams.

335.    Defendants failed to prevent Williams from destroying evidence on his cell phone while in police custody. Defendants Jenkins and Sparks allowed Williams to delete information believed to be relevant to Plaintiff's incident when Williams was in Defendants' custody.

336.    Defendants failed to obtain and preserve the video surveillance cameras found at Williams' apartment.

337.    Defendants failed to investigate the digital devices seized at Williams' apartment before they could be destroyed by Williams.

53

338. Defendants allowed Williams to destroy and alter evidence on his cell phone while in police custody.

339. Defendants Turner, Peters, Sparks, Jenkins, Legault, and Higgins accepted weekly bribes of $2,000 or more from Williams' shell companies and did not investigate Williams' crimes for years because of the bribe and their discriminatory bias against female assault victims as alleged in more detail above.

340. Defendants Turner and Peters dismissed Williams' victims' accounts, claiming that the victims were not credible despite the overwhelming evidence that Williams drugged and raped women.

341. Defendant Peters ridiculed and made jokes about a victim's appearance prior to the victim providing a statement about Williams' sexual assault to JCPD and Dahl.

342. On another occasion, Defendant Peters made jokes about Williams' victims' clothing and appearances.

343. Following her fall, Plaintiff insisted she be tested for date rape drugs, accusing Williams of drugging and assaulting or attempting to sexually assault her. Instead of investigating Plaintiff's incident, Defendants discouraged Plaintiff from pursuing the truth about what happened to her, they questioned Plaintiff's mother regarding Plaintiff's alleged sexual promiscuity and engaged in behavior that is indicative of victim blaming.

344. Defendants Peters and Higgins intentionally failed to investigate Williams' sexual assaults, rapes, and drugging to numerous women, including Plaintiff, despite overwhelming evidence because Defendants financially benefited from the bribes and because of a discriminatory bias against female victims.

345. As a result, Defendants recklessly disregarded Plaintiff's equal protection rights because of Defendants' acceptance of bribes and persistent and widespread denial of law enforcement services.

346. Plaintiff suffered economic harm, bodily injury, and emotional distress because Defendants allowed Williams to continue his acts against women.

**COUNT V**
**Equal Protection, 42 U.S.C. § 1983**
**Violation of Substantive Rights to Due Process.**

347. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

348. Plaintiff has a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, and which constitute a state-created danger.

349. The Defendants' aforementioned actions, including but not limited to the actions of Defendants Chief Turner, Captain Peters, Investigator Sparks, Investigator Jenkins, Investigator Higgins, and Investigator Legault, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Plaintiff with a purpose to harm that was unrelated to any legitimate law enforcement objective.

350. Defendants' actions caused an increased risk to Plaintiff and exposed Plaintiff to an act of violence by a third party.

351. Defendants' failure to prosecute Williams put Plaintiff at a greater risk of harm because Defendants and Williams knew Plaintiff would want the incident at Williams' apartment investigated and Williams had a vested interest in her silence. Through Defendants' intentional failure to investigate and prosecute Williams, Defendants put Plaintiff in a greater risk of harm.

55

352.    By receiving a bribe from Williams and failing to investigate, arrest, and charge Williams for prior crimes, Defendants exposed Plaintiff to the injuries she sustained on September 19, 2020.

353.    Defendant Legault contributed to the violation of due process through witness intimidation, which kept Williams from being investigated and prosecuted.

354.    Defendants' conduct was willful, knowing, wanton, malicious, and conducted with reckless disregard for Plaintiff's rights and safety. As a result, Plaintiff was deprived of her equal protection rights.

355.    As a direct and proximate result of Defendants' actions, Plaintiff suffered extreme pain and injury in the form of economic harm, bodily injury, and emotional distress which persists to this day.

### COUNT VI
### Intentional Infliction of Emotional Distress.

356.    Plaintiff restates and incorporates herein the allegations in the above paragraphs.

357.    Not only did Defendants intentionally and recklessly disregard Plaintiff's case by failing to investigate, arrest, or charge Williams but Defendants intentionally destroyed relevant evidence in their custody and control.

358.    Defendant Sparks intentionally withheld the toxicology report from Plaintiff until after Plaintiff's blood was destroyed by the lab. During the time Defendant Sparks had the toxicology report, Plaintiff continued to call Defendant Sparks for updates and copies of all relevant documents available. However, Defendant Sparks intentionally did not disclose and withheld the toxicology report for months.

359.    Defendants intentionally allowed Williams to keep and use his cell phone in their custody. By allowing Williams to keep his cell phone while in Defendants' custody, Williams destroyed video surveillance showing Plaintiff being pushed out of William's window. Defendants knew this

56

evidence was critical for future legal proceedings. Otherwise, the video surveillance would not have been destroyed.

360. Defendants' intentional and reckless actions by choosing not to investigate, arrest, or charge Williams for his crimes, and intentional destruction of evidence including evidence of Williams pushing Plaintiff out a five-story window, in exchange for bribes is extreme and outrageous and not tolerated by civilized society.

361. As a result of Defendants' intentional and reckless actions during the investigation of Plaintiff's fall, Plaintiff has suffered and continues to suffer from emotional distress.

362. Defendants knew or should have known that their intentional actions during the investigation of Plaintiff's case would cause Plaintiff emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays of this Court as follows:

1. Enter judgment against Defendants and in favor of Plaintiff;

2. Award compensatory damages for physical injuries, medical bills, emotional distress, pain and suffering, and all compensatory and economic damages caused by the actions of Defendants;

3. Award punitive damages;

4. Award reasonable attorney's fees and costs;

5. Pre-judgment and post-judgment interest;

6. Any other relief and award to which Plaintiff may be entitled; and

7. Any other relief and award the Court deems just and proper.

Respectfully submitted on this 3rd day of July 2025.

/s/Ashleigh Beer-Vineyard

Bob Dziewulski (BPR # 037044)
Ashleigh Beer-Vineyard (BPR # 038399)
**DZ Law, PLLC**
4315 Kingston Pike, Ste. 210
Knoxville, TN 37919
(865) 259-0020
bobdz@dzlaw.co
ashleighbeer@dzlaw.co

*Attorneys for Plaintiff*

Case 2:24-cv-00106-JRG-CRW   Document 94-1   Filed 07/28/25   Page 59 of 61
PageID #: 1996

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing has been filed and served via the

Court's electronic filing system on July 2nd, 2025, to counsel of record:

Reid A. Spaulding
Emily C. Taylor
WATSON, ROACH, BATSON & LAUDERBACK, PLC
P.O. Box 131
Knoxville, TN 37901-0131
865-637-1700
rspaulding@watsonroach.com
etaylor@watsonroach.com

Thomas J. Garland, Jr.
MILLIGAN & COLEMAN, PLLP
230 W. Depot Street
P.O. Box 1060
Greeneville, TN 37744
423-639-6811
tgarland@milligancoleman.com

*Attorneys for Johnson City and Karl Turner*


Grace Patton
Kristin Ellis Berexa
FARRAR & BATES
12 Cadillac Drive, Suite 480
Brentwood, TN 37027-5366
(615) 254-3060
kberexa@fbb.law
gpatton@fbb.law
*Attorneys for Toma Sparks*


Daniel H. Rader III
Daniel H. Rader IV
MOORE, RADER & YORK PC
46 N. Jefferson Avenue
P.O. Box 3347
Cookeville, TN 38502-3347
(931) 526-3311
danrader@moorerader.com

danny@moorerader.com

*Attorneys for Kevin Peters*

Laura Beth Rufolo
Philip Aaron Wells
ROBINSON, SMITH & WELLS, PLLC
Suite 700, Republic Centre 633
Chestnut Street
Chattanooga, TN 37450

423-756-5051
lrufolo@rswlaw.com
awells@rswlaw.com

*Attorneys for Justin Jenkins, Brady Higgins, and Jeff Legault*

      */s/Ashleigh Beer-Vineyard*
      Ashleigh Beer-Vineyard (BPR # 038399)

60