IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| MIKAYLA EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:24-cv-00106 |
| | ) | JRG-CRW |
| | ) | |
| JOHNSON CITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

* * * * * * * * * * * * * * * *

VIDEO DEPOSITION OF JUSTIN JENKINS

September 1, 2026

(Portions of Deposition are Attorneys' Eyes Only)

==================================================

JEFF RUSK COURT REPORTING & VIDEO
Registered Professional Reporters
Certified Legal Video Specialists

Jeffrey D. Rusk, RPR, LCR, CLVS
Registered Professional Reporter
805 Eleanor Street, N.E.
Knoxville, Tennessee 37917
(865) 246-7656
Jeff@JeffRusk.com



EXHIBIT
2

Q. What, if any, information did you gather from potential witnesses that were there in the apartment about what had occurred that night with Mikayla Evans?
A. At that point, Sean Williams was there. His -- his story was that they came upstairs. Ms. Evans had gone to the bathroom, I believe, and then she had come out, and then she had just went over to the window, tried to sit down on the ledge and did not think -- I guess she did not know the window was open and not closed, because the way they did -- the way he described it was she sat down and just went back.
Q. Okay. Did he describe anything else happening?
A. No, that's -- not that I remember. No, sir. I don't think they were up there long enough.
Q. Did he describe, at any point in your presence, Mikayla Evans attempting to grab at the window before she fell out?
A. I -- well, I'm getting too confused here, because I also interviewed Bert. So I'm not sure. But I know one of them stated that she did attempt to grab for the window, yes.

Q. He came in and said, "I'm going to take your phone"?
A. Yeah, because he -- I mean, obviously I -- I don't know if he was intentionally playing games or what, but he obviously was going back and forth and he wasn't going to willingly give us a statement. So he was cooperating until that point.
Q. Was this conversation that you had with Sean Williams in the interview room, was it recorded?
A. Yes, sir.
Q. And have you ever reviewed that recording?
A. It's been a while. It's probably been several years.
Q. So you haven't watched it recently?
A. No, sir.
Q. Did you also interview another witness after Sean, after that?
A. Yes, sir.
Q. What was that witness's name?
A. Bert. Is it -- I think it's Albert Watts, I believe, from the depositions.
Q. Albert Watts?

A. Yes.
Q. And did you go over the same Miranda warning with him?
A. I believe I did, sir. Yes, sir.
Q. Now, who brought him into the interview room?
A. After -- I believe we called a couple extra people in to help myself and Investigator Chapman. Actually, we located him in Kingsport. So me and him went and actually went to his residence and then brought him back to Johnson City Police.
Q. Okay. So you went to his residence.
A. Yes.
Q. Is that your testimony?
A. Yes.
Q. And who did you go to his residence with?
A. Investigator Chapman, John Chapman.
Q. And you said you went to his residence in Kingsport?
A. Yes.
Q. How did you travel there? Was it your -- your patrol car or what sort of vehicle did

A. Okay.
Q. But did you capture the entirety of what he said when you were speaking with him?
A. Possibly not, because I probably talked to him prior to, before I even started the statement, and maybe asked him some questions there. Again, I don't recall. But this is the end result. That's what I wanted, to get it documented on paper.
MR. OGLE: Let's go ahead and mark that so I don't forget it. That will be 54.
(Exhibit 54 marked)
Q. (BY MR. OGLE) Now, I'll let you read it.
A. Okay.
Q. Will you read the substance of it?
A. Just read it word for word?
Q. Yeah.
A. The entire statement?
Q. Yeah, the narrative portion. You don't have to read the heading with his information.
A. Let's see. "Mikayla wanted to meet -- Mikayla wanted to GP -- wanted me to GPS Wonderland in Johnson City. When I got to Johnson City, I could not find Mikayla. I called her on the phone and we met outside in downtown Johnson City.

We then hung out at a garage in downtown Johnson City. Then she met a guy that I don't know. They headed out of the garage and told me to come on to get a drink. Once we got up to his apartment, Mikayla went to the bathroom. The guy and I were talking. Mikayla came out of the bathroom and sat down on the window sill of an open window, and she then leaned back, lost her balance, and started to fall. Me and dude tried to catch her but could not. We watched her fall to the ground. The guy and I then ran downstairs to try and help her. There were people everywhere and kind of pushed me out of the way. I stood around for about four to five minutes and then left because I didn't know what else to do."

And that's what starts my questions and answers.

Q. Okay. Will you now read your questions and answers?

A. Q, Investigator Jenkins.

A, Watts, which I had him initial.

The first question was, "How long have you known Mikayla?"

He said, "About a year."

Next question, "Do you know the

name of the guy's apartment you went to?"
He said, "No, I sure don't."
"Had Mikayla been drinking or using drugs?"
"She'd been drinking."
"Do you know if anyone gave Mikayla any drugs?"
"No."
"Who was in the apartment when Mikayla fell out of the window?"
"Just me and the other guy."
"Did anyone push Mikayla out of the window?"
"Oh, god, no."
"How close was the closest person to Mikayla when she fell?"
"At least over 10 feet."
"Do you think Mikayla thought the window was open or closed?"
"I think she assumed the window was closed."
"Did Mikayla have any trouble tonight or get -- got into -- get into any fights or arguments?"
"No, not that I know of."

"Is there anything else you would like to add to this -- to add?"

"No."

Then I have them initial at the end of what they say, and then go down and then sign it.

Q. Will you describe Mr. Watts' demeanor as he was giving you that statement?

A. Absolutely, I will. He was obviously shook up. At one point when he -- when he got to the part where she fell out the window, he started crying. And at the very end he asked me, he said, "I don't know if you can tell me or not," and I knew where he was going with it. He said, "But" -- and I said, "I'll let you know she's alive." And he -- it was like a thousand-pound elephant came off of his shoulders, so --

Q. You mentioned a moment ago that he had said something about "me and dude tried to catch her."

Did you gather any additional information about that?

A. Whatever's in that statement, sir.

Q. Did you ask him any follow-up questions about how they tried to catch her?

A. I don't believe so.

Q. Who would have that information?
A. More than likely, it would probably be in Investigator Sparks' case file.
Q. Now, was a search warrant executed at 10:08 that morning at Sean William's apartment?
A. I don't know an exact time, but that -- that's approximately probable -- probably correct.
Q. What, if any, role did you have in the service of that search warrant?
A. During -- while -- I believe Investigator Sparks obtained the search warrant while either I was in route to get Bert or while I was interviewing Bert. So, either way, they went and started the -- or executed the search warrant while I was still there. So I showed up later, once -- once I had interviewed Bert, we got him back home to Kingsport. I came back and then went to the apartment.
Q. When you got to the apartment, what was -- what was going on?
A. They were in the process of executing the search warrant.
Q. Who all was there at that time?
A. Oh, I know Lieutenant -- well, he's

sexual assault collection, or the preservation or destruction of biological samples from -- taken from the plaintiff."

A. Okay.

Q. You told us just a moment ago that you did, in fact, have a role in submitting Mikayla's blood to the TBI, right?

A. Okay. Again, we help each other in CID. So certain people have certain tasks. So I've never seen the results. And just -- just because I sent off a blood kit doesn't mean that I -- I would have seen the results or done anything else with that.

Q. You would agree with me, however, that you did have -- you did have a role in getting this kit sent off to the TBI.

A. I did the initial collection, yes. Well, I mean, I didn't collect it, but a nurse or doctor collected it.

Q. Where did you gather that sample?

A. I would assume at Johnson City Medical Center.

Q. Johnson City Medical Center.

And what did you do with it once you took it into your custody?



Case 2:24-cv-00106-JRG-CRW Document 265-2 Filed 10/22/26 Page 10 of 11
PageID #: 5257

A. Honestly, I don't recall if I had it in my custody or not. Obviously, I filled out the form. But normally, once a nurse, doctor, whoever collects the blood samples, they put it in the kit. We put that form in there, they seal it up, and then it goes into evidence to be sent to the TBI.

Q. After that point, when you did this with the -- when you went to the Johnson City Medical Center, what other investigative steps did you take on that first day, September 19th, 2020, in relation to what had happened with Mikayla Evans?

A. I don't recall. I could have helped with any evidence submissions. There's little things I could have helped with during that day, because we were already -- I was already called in. So I wouldn't have just left everybody to do the work. So I can't give you a specific job that I did, but I would say I helped with something.

Q. What other role did you play in this investigation after that initial day?

A. I did not.

Q. Now, you said earlier -- you talked about this safe that was collected coming back to the Johnson City Police Department, right?