IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| MIKAYLA EVANS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) No. 2:24-cv-00106 |
| | ) JRG-CRW |
| | ) |
| JOHNSON CITY, et al., | ) |
| | ) |
| Defendants. | ) |

* * * * * * * * * * * * * * * *

VIDEO DEPOSITION OF JEFF LEGAULT

September 1, 2026

(Portions of Deposition are Attorneys' Eyes Only)

==================================================

JEFF RUSK COURT REPORTING & VIDEO
Registered Professional Reporters
Certified Legal Video Specialists

Jeffrey D. Rusk, RPR, LCR, CLVS
Registered Professional Reporter
805 Eleanor Street, N.E.
Knoxville, Tennessee 37917
(865) 246-7656
Jeff@JeffRusk.com

STENO.COM
(888) 707-8366

EXHIBIT
3

A. Nothing other than maybe something came up at the table where we're like, "What is happening right now?" I mean, but nothing in-depth of any questions or answers or anything like that.
Q. I want you to describe at this point, do you have any issues with memory recall, anything like that generally?
A. No.
Q. Okay. No diagnosis or anything related to your memory?
A. No.
Q. If you will, please, describe your assignments at the Johnson City Police Department from 2019 to today.
A. I was a sergeant over the Special Investigations Unit at the time of 2019. After that assignment, I went back to patrol as a sergeant, and I think that was in 2022. Got promoted to lieutenant over patrol in 2023, '3 or '4, and then currently captain, I got, in 2025.
Q. Now, back when you were a lieutenant over the patrol division, who was your captain at that time?
A. Captain Jeff Wilson, I believe, is who it was.

Q. What was his -- who did he report to?

A. I believe he still reported to -- I'm not sure who his sergeant was. I don't know who his sergeant was.

Q. I want to talk to you a little bit about the night -- specifically, I want to talk to you a little bit about your testimony that you gave during the Dahl case, the deposition on October the 17th of 2023. Let's first talk about that.

A. Okay.

Q. Do you recall, during the course of that deposition, discussing a search that occurred on September the 19th of 2020 at Sean Williams' apartment?

A. I don't recall it, but I -- I'm sure we did discuss it.

Q. Well, at some point, were you asked about it?

A. I'm sure I was.

Q. Do you recall what, if anything, that you said about it at that time?

A. If it was in reference to the search of the apartment, I probably told them I wasn't there.

Q. Why did you tell them that you -- that you weren't there?
A. Because I wasn't.
Q. You were not there when the search warrant was served on Sean Williams' apartment?
A. No, sir.
Q. Okay. And that's your testimony here today?
A. Yes, sir.
Q. I want to ask you next about a deposition that occurred with Toma Sparks during that same case.
Do you recall -- were you present when Mr. Sparks was just -- or Investigator Sparks was deposed in the Dahl case?
A. I don't think I was.
Q. And I think we stated earlier that you were deposed on October the 17th of 2023, right?
A. That sounds right. I'm going with it.
Q. Okay. That's the date that's on the top of the exhibit, right?
A. Sure.
Q. Just make sure.
A. Okay. Yeah.

Who all was present when the safe was opened?

A. There was several. Obviously, myself and Investigator Sparks. Lieutenant Shepherd was there. I think he's the one that set up the tripod video. Investigator Stillwagon was there. There's a couple others from CID. I don't remember who they were.

Q. Where did that occur?

A. In the basement of the police department.

Q. In the basement of the police department.

Do you know how the safe got to the basement of the police department?

A. I do not.

Q. When the safe was opened, you've described who was present.

I want you to now -- I'd ask that you describe what was inside that safe.

A. Oh, there -- I mean, there was a lot of paperwork. Some like titles and deeds. There were some bags, like clear plastic bags, if I remember right. Obviously, there was a bag and a box of money that was in there. There was a baby

doll that was in there.
Q. Let's talk for just a second about the currency.
A. Yes.
Q. Okay. How was that currency -- how was it in the safe? Can you describe that, the characteristics and how it was contained?
A. The best I can remember, there was just a bag that just had loose stuffed money in it. And then there was a box that also wasn't loose, but it wasn't banded. It was in a box.
Q. Okay. Who counted that money?
A. As far as I know, nobody. I don't know.
Q. Do you recall the denominations, the amount of money, anything like that?
A. I do not.
Q. At any point, was the -- the money removed from that bag -- those bags?
A. It was removed from the safe. I don't recall actually taking the money out of the box or the bag.
Q. So it's your testimony that you never took the money out of the box or out of the bag.

A. Not that I recall. I don't remember doing that.

Q. Do you recall if anyone ever counted that money?

A. I don't.

Q. I want to talk to you for just a second about your training.

Have you all ever received training on how to deal with cash and things like that?

A. Yes, sir.

Q. Okay. And can you describe that training?

A. Sure. So, it's basically if you're -- if there's a large sum of money, or any sum of money, you're to count it in front of the person if they're there. If they're not, you're supposed to do it in front of a video camera, which we did. But I don't know that the money was ever counted. It was taken out of the safe.

If we seize the money, obviously we're supposed to have a seizure form where you put each denomination of money and you seize it by that. And then the owner would get a copy of that seizure paperwork. I mean, it should -- the money -- working it from an SIS investigation, I probably

would have counted the money, wrote down the denominations.

However, this safe was given back, and I don't think there's any training or any GO that says, if the money is going to be returned that day, that you have to document that money.

Q. Well, just so we all know, what does SIS mean?

A. Special Investigations Unit. It's basically a narcotics unit.

Q. Gotcha.

There is a general order that governs the evidence collection related to cash, right?

A. Yes.

Q. Okay. And the requirements that you discussed a moment ago, how you would normally handle that, that's essentially what's under the general order --

A. Yes.

Q. -- right?

And in this case, would you agree with me that what's described under that general order, and I think it's General Order 200.76, that was not followed in -- in dealing with this cash.

MR. WELLS: Object to the form.
Q. (BY MR. OGLE) Go ahead.
A. Yeah. I'm trying to figure out how to answer this.
Without looking at the specifics of the GO, I think what happened in this particular case is, where no money was seized, it was placed back into the safe and returned. Therefore, there wasn't an inventory done on it. So that way, that -- for that reason, they -- I assume they didn't count it because it was going back to him.
Q. At that time, do you recall who all present in the room observed what was happening with this cash?
A. Everybody I just named. The same ones, they stayed there.
Q. Everyone you named?
A. Yes.
Q. Did you see anyone touch this cash?
A. No. I'm pretty sure, unless -- no. I'm pretty sure the only persons that may have even touched anything were myself and Toma to take it out and put it back in.
Q. Let's talk about the other items in the safe.

Who removed the other items you described that were in the safe? Who removed them from the safe?

A. I removed the majority. If there's anything else that was removed, Toma would have helped me remove them.

Q. Did you sign any property or inventory receipts related to what was contained within the safe?

A. I did not.

Q. Do you know who did?

A. I do not.

Q. Tell me about the K9 and its role at the safe.

A. I can't remember when they asked me to perform a free-air sniff of that safe, but I was working a dual-purpose K9, which basically just means he works patrol and then he can do drug sniffs.

I don't know if it was the day of that they took the search warrant out, or the day before they took the search warrant out on the safe, they asked me to -- somebody. I assume it was Toma, but I'm not 100 percent sure if it was Toma, asked me if my dog could perform a free-air sniff on the

Who removed the other items you described that were in the safe? Who removed them from the safe?
A. I removed the majority. If there's anything else that was removed, Toma would have helped me remove them.
Q. Did you sign any property or inventory receipts related to what was contained within the safe?
A. I did not.
Q. Do you know who did?
A. I do not.
Q. Tell me about the K9 and its role at the safe.
A. I can't remember when they asked me to perform a free-air sniff of that safe, but I was working a dual-purpose K9, which basically just means he works patrol and then he can do drug sniffs.
I don't know if it was the day of that they took the search warrant out, or the day before they took the search warrant out on the safe, they asked me to -- somebody. I assume it was Toma, but I'm not 100 percent sure if it was Toma, asked me if my dog could perform a free-air sniff on the

safe.
Q. Did you do that?
A. I did.
Q. Can you describe what happened?
A. Sure.
The -- I mean, I don't recall exactly, but obviously my dog alerted on the safe, meaning that there was an odor of narcotics inside the safe.
The reason I say that is because I'm pretty certain in the search warrant he used that as probable cause, some of the probable cause to open the safe.
So my dog alerted on the safe, meaning that there is an odor of narcotics that, at some point, probably had narcotics in that safe or somebody touched the safe with narcotics on their hands or something. So he alerted on the safe.
Q. Let's go -- let's go back for just a moment to the night of -- the night of the incident there at Sean Williams' apartment.
Were you present when officers initially made entry into Sean Williams' apartment?
A. No, I wasn't working that day.
Q. Were you called at all that

property receipt at any point?
A. No.
Q. Was there any jewelry inside the safe?
A. I don't -- I don't remember. There could have been. I don't -- I don't recall there being jewelry, but I'm not going to dismiss that there wasn't.
Q. Up to this point, you haven't mentioned any jewelry. I asked about that.
A. Sure.
Q. And you say -- and I don't want to misstate your testimony. It's that you don't recall if there was jewelry inside the box.
But you've described multiple other things that were inside the safe, right?
A. Yes.
Q. Was there any sort of necklace inside the safe?
A. Not that I remember. I don't recall a necklace. I don't remember a necklace.
Q. Did you see anyone take anything from that safe?
A. Nobody -- not while I was present. Nobody took anything from that safe. I took -- we