IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| MIKAYLA EVANS,<br><br>Plaintiff,<br><br>v.<br><br>JOHNSON CITY, et al.,<br><br>Defendants. | No. 2:24-cv-00106<br>JRG-CRW |

* * * * * * * * * * * * * * * *

VIDEO DEPOSITION OF TOMA SPARKS

September 2, 2026

(Portions of Deposition are Attorneys' Eyes Only)

===================================================


JEFF RUSK COURT REPORTING & VIDEO
Registered Professional Reporters
Certified Legal Video Specialists

Jeffrey D. Rusk, RPR, LCR, CLVS
Registered Professional Reporter
805 Eleanor Street, N.E.
Knoxville, Tennessee 37917
(865) 246-7656
Jeff@JeffRusk.com




EXHIBIT
4

Tennessee Bureau of Investigation for any form of examination?

A. No. But later on, further on down, the FBI did do that phone with all of them other devices, but it was wiped.

Q. So eventually someone did attempt to do those things.

A. Yes.

Q. But you did not.

A. I did not, no.

Q. Okay. Was there another item that was -- another large item that was taken from the apartment on the early morning -- I guess it was 10 a.m. when you executed the search warrant at Sean Williams' apartment.

A. What do you mean large item?

Q. Were there any other items?

You've described computer devices and Arlo cameras.

Was there anything else?

A. A safe.

Q. A safe.

Okay. Let's talk about the safe.

A. Okay.

Q. Okay. What type of safe was it?

A. Liberty.
Q. How big was this safe?
A. I'd say it was probably close to 5 feet tall.
Q. These things are pretty heavy, right?
A. Very heavy.
Q. How did you all get it out of his apartment?
A. We contacted our -- Officer Watson with our property and evidence. He came in with a truck and a dolly, and we took it down the elevator, and the truck has a liftgate on it.
Q. Where did you take it?
A. Took it to property and evidence at our headquarters.
Q. Why did you take the safe?
A. They could hold devices that could record, or SD cards. It could have items of that inside of it.
Q. Devices that --
A. Video-recording devices. Yes, sir.
Q. Were you concerned that it might contain anything else?
A. Later on, after we ended our

"On September 19, 2020, at approximately 10:08 hours, officers executed a search warrant at 200 East Main Street, Suite 500, Johnson City, Tennessee 37604. During the search, officers noticed that the video cameras that were inside the residence prior to the search had been taken down, and officers located at Liberty safe, Serial No. L001581400, and has the word Revere on the lower front. The safe was located inside a bedroom."

"During the search, a small plastic baggie containing a white powder substance was located in the same bedroom as the safe. The baggie was sitting on the back edge of the bookshelf behind a ceramic art piece. It appeared to be hidden there."

"Also during the search, an empty holster was located on the bed in the bedroom where the safe was located. The holster contained a handgun magazine. Sean Williams' criminal history shows that he is a convicted felon."

"The safe was transported to the Johnson City Police Department located at 601 East Main Street, Johnson City, Tennessee, 37601. The Liberty safe, Serial No. L001581400, was secured in

the police department's evidence room."

"Investigator Jeff Legault performed a free air sniff around the safe with his K-9 partner, Pico. Pico is a narcotic trained police K-9 trained on the odors of methamphetamine, cocaine, heroin, and marijuana. Pico was certified in March of 2020 by the National Police Working Dog Association. Pico alerted to the presence of narcotics."

Q. Okay. So Pico had alerted to the presence of narcotics in the safe.

A. Correct.

Q. Had you made any request, before you got this search warrant, to either Sean Williams or his attorney for consent to open it?

A. We did.

Q. Tell me about that.

A. While we was still at the condo, sergeant Hilton was having a conversation with his attorney and him about giving us a code to get in the safe. So we brought -- brought it -- brought Sean Williams in. He was attempting to open it, but he couldn't open it or wouldn't open it.

So then we gave him another chance. And then he wrote on a piece of paper that, under

Q. Now, down in evidence where this safe was being stored, and you describe that -- I don't want to misstate it. I think you've described it as a hallway.

A. There's a long hallway as you come down the stairs. We got our gym here. You walk down a long hallway, and it's down toward the far end where the property and evidence is.

Q. Who was present when you opened this safe?

A. It was -- well, I didn't open the safe.

Q. Who did?

A. It was Sergeant Matt Gryder.

Q. How did he open the safe?

A. From what I recall, they got the code. It was the code from the Mahoney's. They have Liberty safes. So they called them, contacted them and got, I guess, the generic code when you buy one.

Q. Okay.

A. And that's how they opened it.

Q. And he opened the safe?

A. Correct.

Q. Were you present when the safe was



Case 2:24-cv-00106-JRG-CRW Document 265-4 Filed 10/22/26 Page 6 of 12 PageID #: 5277

opened --
A. Yes.
Q. -- for the first time?
Who else was present when it was opened?
A. It was me, Sergeant Gryder, Lieutenant Don Shepard, Sergeant David Hilton, Sergeant Jeff Legault. I want to say -- let me think.
I think that's all I can recall right now.
Q. Do you recall at any point Officer Jenkins being there?
A. No.
Q. When was this safe opened?
MS. BEREXA: Object to the form.
Q. (BY MR. OGLE) What day was the safe opened?
MS. BEREXA: Object to the form.
A. Same day.
Q. (BY MR. OGLE) What time?
A. Oh, gosh. I don't know.
Q. Does September 23rd, 2020 at 13:10 hours sound right?
A. That's correct.

Q. Okay. And you described the individuals that were there when it was opened.
Do you know where everyone was in this hallway when the -- when the safe was opened?
A. It's not a long hallway, but the safe was sitting here and we were out front of it.
Q. Was there someone recording the opening of the safe?
A. Yes, Sergeant Hilton put a video recording -- recording on a tripod in front of the safe.
Q. Why was it being recorded?
A. Just in case somebody, like this, comes back and says we took something from the safe.
Q. Did you all have any policy that required the recording of the opening of that safe?
A. Not that I recall.
Q. Were photographs taken of the contents of that safe?
A. Yes.
Q. Who took the photographs?
A. I did.
Q. Now, I want you to describe for me what was inside the safe once it was opened.
A. There was ammunition. There was a

A. We did not.
Q. Did you find any drug ledgers?
A. No.
Q. At that time, when you removed these things from the safe, what did you do with them?
A. I photographed them and took the ammunition, and everything else was put in the safe.
Q. Did you inventory these items?
A. No.
Q. Why not?
A. Just what we were taking, which was the ammo.
Q. Why didn't you inventory everything that was inside the safe?
A. Because we weren't taking any other items. They were going back into the safe -- safe and going to be released back to him.
Q. So the plan was that anything that you didn't inventory or didn't -- you didn't seize, you intended to return back to him.
A. That's correct.
Q. Okay. Now, that search warrant that we were just looking at a moment ago for this safe will be in Exhibit 80.

that I've done, and I let Sergeant Hilton review it.

Q. But you did ask permission to seize cash that you found.

A. Yes.

Q. Okay. Tell us what happened to the safe after you all completed your search of the items contained inside of it.

A. After we did our search, I took the ammunition out, what we were seizing. Everything went right back inside, and the safe was locked.

Q. And where was it held?

A. It stayed where it was, where we searched it.

Q. How long was it held there?

A. I went that day, the same day, gave -- talked to Sean Williams outside, gave him the search warrant. Had that conversation I just explained to you, what we had, gave him the number to property and evidence to contact them to set up a time to come and pick it up. And from what I recollect, he came and picked it up the next day on the 24th -- 24th of September.

Q. Who asked for it back?

A. Huh?

Q. Who asked for the return of the

A. We spoke to Kat Dahl about it and about getting a federal indictment on it, and I gave her that information.
Q. Did you discuss it with anyone else?
A. My supervisor, Sergeant Hilton.
Q. Sergeant Hilton?
A. Yes, sir.
Q. Did you speak to anyone else that you worked with about that information?
A. Not that I recall. I may have.
Q. Did you speak with the district attorney at some point about that information?
MS. BEREXA: Object to the form.
A. I don't believe I did.
Q. (BY MR. OGLE) Okay. I want to talk to you next -- I'm going to move forward into May of 2021.
Okay. At some point before May of 2021, had you testified in front of a grand jury regarding Sean Williams?
A. A federal grand jury, yes, sir.
Q. Tell us about that.
A. It was after I talked with Kat Dahl about getting a federal indictment. I gave her

everything that I had involving Mikayla's case and what we found in the safe, and we did a federal indictment on him.

Q. And what were -- what was this federal indictment for? What was being alleged?

A. A convicted felon with possession of ammunition.

Q. Felon in possession of a weapon, ammunition.

A. Ammunition.

Q. Ammunition. Excuse me.

Do you know when that indictment was issued?

A. On April 14th of '21.

Q. April 14th of '21?

A. Correct.

Q. After that indictment was issued, were you all looking for -- or did you look for Sean Williams?

A. I did.

Q. What did you do to look for Sean Williams?

A. Set up around his condo, see if we can catch him out.

Q. Who went on this stakeout with you?